A07A0932. BUILDING MATERIALS WHOLESALE, INC.
v. TRIAD DRYWALL, LLC.
(653 SE2d 115)

JOHNSON, Presiding Judge.

Triad Drywall, LLC sued Building Materials Wholesale, Inc. ("BMW") for breach of contract. A Fulton County jury awarded Triad $160,000 in damages and $14,480 in attorney fees. BMW appeals from the judgment entered in accordance with the verdict. For the reasons that follow, we reverse and remand for a new trial on the issue of damages for breach of contract and Triad's attorney fees claim.

Viewed in the light most favorable to the jury's verdict,[1] the evidence shows that Triad is in the business of installing drywall, metal studs, and acoustic ceilings in commercial and large residential building projects. Triad purchased materials from a number of suppliers, including BMW.

---

[1] See *Vojnovic v. Brants*, 272 Ga. App. 475 (612 SE2d 621) (2005).

In May 2003, Triad received a letter from Aviation Constructors, Inc. in which Aviation expressed its intent to hire Triad as a subcontractor on the Bartow Center, Phase I, Floyd College project (the "Project"), conditioned upon Aviation receiving a construction contract for the Project. As part of its job preparation, Triad solicited quotes from material suppliers. Through its salesman, David Dye, BMW submitted a "project quotation" for the "Floyd College Campus Phase I" which, along with a price schedule, indicated a "Bid Date: 10/22/2003," "Expires: 4th quarter 2004," and notation at the bottom that "Prices good until next manufacturer[']s increase." Triad's operation manager, Ziv Gal, contacted Dye and told him that Triad would be purchasing its material through BMW.

According to Dye, BMW's price quote was good until the end of the fourth quarter of 2004. Dye agreed that the verbal notification from Triad was an acceptable method of notifying BMW that Triad accepted the proposal, and typical in the industry. Dye also agreed that BMW expected, based on Triad's commitment, that Triad would purchase the materials.

During the second week of January 2004, Dye informed Gal that there was a shortage of materials and market prices were going up. Dye asked Gal to place an order for the materials so that BMW could, in turn, buy the materials and avoid a cost increase to BMW. On January 20, 2004, Triad submitted a purchase order specifying the quantity of materials it needed for the Project, which further stated: "As you requested, this is the material list for Floors 1 & 2. Please stock it and we will take delivery mid-February."

On January 29, 2004, BMW principal Mike Gist submitted an adjusted price schedule to Gal, stating that manufacturer price increases for building materials made the adjustments necessary and asking whether Triad wanted BMW to proceed with the order based on the adjusted prices. Gal responded that Triad expected BMW to honor its commitment to sell the material at the originally quoted prices. Gist reiterated BMW's position in a letter dated February 9, 2004, and Dye, Gal, and Gist subsequently met at Triad's office to discuss the matter. Gal informed Gist and Dye that Triad would ask Aviation for an increase in BMW's contract price to defer the rise in material costs, but otherwise Triad expected BMW to honor the original quote. After the meeting, Gist and Dye discussed "why we should sell [the material] for this amount when we can sell it for more to someone else."

Triad started work on the Project during the first week of March 2004 performing the jobs that it could while waiting for delivery of the majority of the materials. Before that time, BMW obtained liability insurance and a performance and payment bond in accordance with its agreement with Aviation.

On March 15, 2004, Aviation's project manager wrote to Triad declining Triad's request for additional monies for steel studs, and expressing his irritation at Triad for having brought the subject up after the request had been previously discussed. Aviation then indicated that Triad could sign its subcontract agreement that day and provide written confirmation of the steel stud delivery date, or Aviation would contract with another company to do the work.

Triad maintained daily contact with Dye to check on the status of the materials, which BMW received on March 17, 2004. After the materials were delivered to BMW, Gal called Aviation to schedule a delivery to the job site, but there was a delay due to several days of rain. Triad informed BMW that it was not ready for the materials, but never said that it did not want the materials. Three or four days later, BMW sold the materials to another drywall company, AFM Interior Systems, Inc., for over $48,000 more than had been originally quoted to Triad. Triad was unable to do its work on the Project without the materials, and Aviation awarded the Project subcontract to AFM.

Evidence showed that BMW knew that when it submitted its price quote that the materials ordered by Triad were intended for the Project, that by January 2004 the lead time for ordering the materials was approaching eight weeks and growing, and that BMW knew that there were shortages that would cause Triad to have a "tough time" obtaining the materials from another supplier.

1. In its first claim of error, BMW challenges the jury's $160,000 damage award on the ground that "Triad never got a subcontract for the Floyd College project through no fault of BMW." In presenting its argument BMW does not cite to any supporting authority, as required by Court of Appeals Rule 25 (a) (3), and we have difficulty in discerning the particular issue or issues which BMW wishes to assert. It is apparent, however, that BMW contends that the evidence was insufficient to support a recovery for consequential damages for breach of the contract between BMW and Triad arising out of Triad's inability to perform its agreement with Aviation.[2] "[A] jury verdict, after approval by the trial court, and the judgment thereon will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law."[3]

The evidence shows that Triad never signed its subcontract with Aviation. BMW argues that Triad never had a signed subcontract

---

[2] A buyer may recover consequential damages for a seller's repudiation or nondelivery. See OCGA § 11-2-713. Consequential damages include "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." OCGA § 11-2-715 (2) (a).

[3] *Horan v. Pirkle*, 197 Ga. App. 151, 153 (2) (397 SE2d 734) (1990).

with Aviation because Aviation resisted Triad's attempts to "blackmail" Aviation for more money, and that Triad's loss of the subcontract could not be attributed to BMW. As to BMW's "blackmail" accusation, the evidence did not demand that the jury conclude that Aviation's decision to award the subcontract to Triad's competitor was due to Aviation's irritation at Triad's request for more money. Triad's request for more money from Aviation in connection with the cost of the metal studs was consistent with Ziv Gal's promise to Gist to ask Aviation for additional money to defer the increased costs of material to BMW, and not "blackmail," and central to Aviation's demand that Triad sign the subcontract was that it confirm a delivery date for the metal studs. Evidence also showed that it was customary in the construction business for a subcontractor to start work after receipt of the letter of intent but before the actual subcontract is executed, and Triad started its work on the Project without a signed subcontract in this instance. After Triad was unable to finish the work on the Project, Aviation demanded $130,200 "due to Triad not honoring agreement," while crediting Triad $3,000 in connection with a previous pay request. "Assent to the terms of a contract may be given other than by signatures."[4] In view of the foregoing, the jury was authorized to find that there was an agreement between Triad and Aviation for Triad to work on the Project, and Triad was unable to perform the work because BMW breached its contract to supply materials to Triad.

2. BMW further contends that the jury's $160,000 damage award was not supported by any evidence because Triad did not prove the amount of its lost profits. We agree.

Typically, a plaintiff who is seeking to recover lost future profits argues that such profits would have been derived from a transaction that was never completed because of a contract breached by the defendant or a tort committed by him. In a case such as that, it is incumbent on the plaintiff to show what revenues he would have obtained from the transaction, as well as the expenses he would have incurred in generating those revenues. The plaintiff must prove both anticipated revenues and expenses with reasonable certainty in order to recover.[5]

---

[4] *Cochran v. Eason*, 227 Ga. 316, 318 (1) (180 SE2d 702) (1971).

[5] *Bennett v. Smith*, 245 Ga. 725, 726-727 (267 SE2d 19) (1980). In certain instances, however, as *Bennett* shows, lost revenues may be awarded as damages without deduction of production expenses attributable to the lost revenues, such as where expenses remain fixed during a production stoppage. Id.

Since Triad was seeking to recover lost profits from a transaction that was never completed, Triad was required to prove both its anticipated revenues and expenses with reasonable certainty.[6] Evidence showed that Triad's anticipated revenue on the Project was $998,800, which was the amount of the contract between Triad and Aviation. Triad did not, however, show its anticipated expenses on the Project other than the cost of materials from BMW and certain insurance and payment bond costs. Rather, Ziv Gal testified that he anticipated $300,000 in profits from the Project based on a planned profit margin of 30 percent. According to Gal, "the profit that [Triad is] asking for here [is] based on the history of Triad's profit based on other jobs in the prior few years." Gal testified to the contract price, cost, and profit of four specific projects in which Triad's profit, as a percentage of the contract amount, ranged from 29 percent to 33 percent. According to Gal, Triad's average profit margin was 36 percent, although the exhibit introduced into evidence which listed Triad's profit on its various projects in 2004 and 2005 showed that profits ranged from 16 to 63 percent of project revenues. Gal also testified that Triad used all labor, material, equipment, and some overhead costs in determining its profit, but did not testify as to the anticipated amount of those costs as it related to the Project. When BMW's counsel asked Triad principal Gadi Gal if he could give the cost figures for the Project, Gal responded that "I don't have that in front of me."

Triad contends that because it had established a "track record" of profits that it could establish its lost profits by evidence of its past earnings. As a rule,

> anticipated profits are too speculative to be recovered, but where the business has been established, has made profits and there are definite, certain and reasonable data for their ascertainment, and such profits were in the contemplation of the parties at the time of the contract, they may be recovered even though they can not be computed with exact mathematical certainty. *Nonetheless*, to recover lost profits one must show the probable gain with great specificity as well as expenses incurred in realizing such profits. In short, the gross amount minus expenses equals the amount of recovery.[7]

---

[6] Id.

[7] (Citation omitted; emphasis supplied.) *KAR Printing v. Pierce*, 276 Ga. App. 511 (623 SE2d 704) (2005).

Thus, evidence that Triad was a well-established, profitable business was relevant to show that it was entitled to a recovery, but Triad was also required to introduce evidence of expenses associated with its work on the Project.[8] "[Triad] having failed to put up any evidence of [its] anticipated expenses, [its] proof of lost profits was insufficient as a matter of law."[9]

Relying on *Witty v. McNeal Agency*,[10] Triad argues that BMW waived any right to object to the sufficiency of the evidence on appeal since it failed to object on that basis below. We disagree. We concluded in *Witty* that, as to their claim that the trial court erred in admitting the evidence, the "[p]laintiffs waived [their] objection to the admission of evidence of loss profits without proof of expenses for failure to assert such reason before the trial court."[11] In the next division, however, we considered whether the jury's award was authorized by the evidence, including the evidence of expenses.[12] Furthermore, by statute, "[t]he entry of judgment on a verdict by the trial court constitutes an adjudication by the trial court as to the sufficiency of the evidence to sustain the verdict, affording a basis for review on appeal without further ruling by the trial court."[13]

In view of the foregoing, we conclude that the evidence was insufficient to sustain the jury's damage award. BMW is entitled to a new trial on the issue of damages for breach of contract.[14]

3. BMW further contends that the evidence did not authorize the jury to award attorney fees under OCGA § 13-6-11. We do not reach the merits of this issue because reversal of the damage award for breach of contract requires that we reverse the award of attorney

---

[8] See *Williamson v. Strickland & Smith, Inc.*, 263 Ga. App. 431, 435 (2) (587 SE2d 876) (2003) (without evidence of anticipated expenses, proof of lost profits was insufficient for damage recovery); *Authentic Architectural Millworks v. SCM Group USA*, 262 Ga. App. 826, 831-832 (4) (586 SE2d 726) (2003) (evidence of lost gross profits not sufficient to show lost net profits); *Shaw v. Ruiz*, 207 Ga. App. 299, 304 (11) (428 SE2d 98) (1993) (lost profits were not recoverable where there was no evidence from which net profits could be calculated).

[9] (Citation omitted.) *KAR Printing*, 276 Ga. App. at 512.

[10] 239 Ga. App. 554 (521 SE2d 619) (1999).

[11] Id. at 562 (5).

[12] In that instance, the damage claim was for lost commissions and there were no expenses attached to the commissions because overhead costs were fixed. Id. at 563 (6).

[13] OCGA § 5-6-36 (a).

[14] BMW does not appeal from a denial of motion for directed verdict, and so a new trial is the appropriate remedy. See *Aldworth Co. v. England*, 281 Ga. 197, 199 (2) (637 SE2d 198) (2006). Although BMW did move for a directed verdict on the basis of Triad's failure to prove lost profits, it does not appear that the trial court ever ruled on the motion. See, e.g., *Bell v. Owens*, 230 Ga. App. 826, 828 (3) (497 SE2d 591) (1998) (failure to obtain ruling on motion for directed verdict waived issue).

fees.[15] "Because litigation expenses (costs and attorney fees) are wholly ancillary, they are not recoverable when no damages are awarded."[16]

4. Since we have ordered a new trial on the issue of damages, BMW's claim that the trial court erred in admitting certain exhibits due to a lack of foundation is moot.

In sum, the judgment of the trial court is reversed, and the case is remanded for a new trial on the issue of damages for breach of contract and attorney fees.

*Judgment reversed and case remanded with direction. Phipps and Mikell, JJ., concur.*

DECIDED OCTOBER 10, 2007.

*Dock H. Davis*, for appellant.
*David J. Merbaum*, for appellee.

---

[15] *Chong v. Reebaa Constr. Co.*, 284 Ga. App. 830, 834 (3) (645 SE2d 47) (2007).
[16] (Citation and punctuation omitted.) Id.