**WHOLE COURT**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 26, 2014**

# In the Court of Appeals of Georgia

A13A2134. DOUBLE VIEW VENTURES, LLC et al. v. POLITE

MILLER, Judge.

Nathaniel Polite filed a premises liability suit against Double View LLC ("Double View") and Westdale Asset Management Ltd. ("Westdale"), the owner and property manager, respectively, of the apartment complex in which he lived at the time he was attacked by unknown assailants. Following a trial, the jury returned a verdict for Polite, determining that Double View and Westdale (collectively, "the Defendants") were significantly at fault for Polite's injuries, Polite was somewhat at fault, and the unknown assailants were not at fault. The Defendants appeal from the denial of their motion for new trial, contending that the trial court erred in: (1) refusing to allow the jury to consider an apportionment of fault with respect to the nonparty owner of the property adjacent to the apartment complex; (2) denying their

motion for new trial on the basis that the jury's failure to assign fault to the criminal assailants was contrary to or strongly against the evidence; (3) giving a charge on proximate cause that was inconsistent with the statutory requirement regarding apportionment of fault; and (4) in excluding bad character evidence after Polite elicited testimony showing his good character. For the reasons that follow, we reverse.

Viewed in favor of the verdict,[1] the evidence shows that on the evening of May 30, 2007, Polite, then a resident of Stonebridge Apartments, walked along a dirt-path leading from the parking lot in front his apartment to the Chevron gas station located adjacent to the apartment complex. It was well documented that residents of the apartments and their guests would use that path to go to the Chevron convenience store. The path went up a small hill to a wooden fence, which served as a boundary between the two properties, and the wooden fence had an opening that allowed for access back and forth across the properties. Polite passed through the fence and then continued walking to the Chevron station's convenience store, where he bought a soft drink and a pack of cigarettes. Polite then exited the store and began walking back to his apartment.

---

[1] *Barnett v. Farmer*, 308 Ga. App. 358 (707 SE2d 570) (2011).

As Polite walked back through the fence, two assailants, who were hiding behind the wooden fence, threw bleach into his face. Polite, whose eyes were burning, started running down the hill towards his apartment and screaming for his friends. One of the assailants then fired a gun, and the bullet struck Polite in the back, injuring his spine. It was not known if the assailants came from the apartment complex or the Chevron station.

Polite was subsequently taken to a hospital for his injuries and he remained there for several months. As a result of the gunshot wound, Polite has difficulty walking, requires the use of a cane, is unable to stand for long periods of time, and has bowel and bladder problems. Polite's assailants were never apprehended.

In the three years preceding the attack on Polite, at least a dozen armed robberies and a number of aggravated assaults had occurred at the Stonebridge Apartments. Furthermore, approximately two weeks prior to Polite's attack, an apartment resident was attacked soon after passing through the wooden fence as he was walking back home along the dirt path from the Chevron station. That individual reported the incident to the complex manager of Stonebridge Apartments. Another attack was also reported to the complex manager approximately one week before Polite's attack.

A security expert testified that given the documented history of armed robberies and aggravated assaults at Stonebridge Apartments, the access and perimeter control for the property fell below the standard of care. The security expert testified that, while the apartment complex had wrought-iron gates and chain link fencing surrounding most of the property, the use of the wooden fence as a means to control access from the convenience store was inadequate. The security expert also testified that the wooden fence was actually harmful because it provided a cover for would-be assailants to hide behind while waiting for victims. A former Stonebridge Apartments security guard testified that, beginning in January 2007, he made numerous reports to management identifying the opening in the wooden fence as a significant security violation, because it left residents unprotected. The security guard stated that nothing was done to respond to his concerns.

Following his attack, Polite sued the Defendants, alleging that they were negligent in failing to exercise ordinary care in keeping the premises safe and that their failure to provide adequate security in light of the prior criminal activity was the proximate cause of his injuries. Following a trial, the jury returned a verdict for Polite, finding that he was 13% at fault and the Defendants were 87% at fault. Although the unknown assailants were on the verdict form, the jury did not apportion

4

any fault to them. Pursuant to the trial court's ruling, the verdict form did not include the name of Chevron gas station for the jury to determine whether it should be apportioned fault.

1. On appeal, the Defendants contend that the trial court erred in refusing to allow the jury to consider the percentage of fault of the Chevron station and to apportion damages among the Defendants and Chevron station, pursuant to OCGA § 51-12-33. We agree.

Prior to trial, the Defendants filed three different notices of intent to seek apportionment of fault among non-parties as well as parties pursuant to OCGA § 51-12-33 (d). The three notices named at least three different entities as the owner of the Chevron gas station located adjacent to the Stonebridge Apartments.

At trial, evidence was elicited that, in addition to the criminal incidents on the apartment complex property in the three years preceding Polite's attack, there were approximately nine robberies or assaults on the Chevron property, both inside and outside the store. Other evidence showed that the wooden fence in question was built by the owners, or former owners, of the Chevron station. A survey of the Chevron property shows that the fence is 12 feet away from the property line abutting Stonebridge Apartments.

5

A former Stonebridge Apartments complex manager testified that the Defendants began repairing the fence after individuals ripped out planks in order to cross between the convenience store and the apartment complex. The manager further testified that she attempted to contact the owners of the Chevron station to determine who was responsible for the fence and to propose sharing the costs of installing a wrought-iron fence, however, she received no response from the Chevron station owners. The manager also stated that the Defendants ultimately installed a wooden gate to deter people from tearing off planks from the fence.

Following the close of evidence, the trial court considered Polite's motion for a directed verdict on the issue of putting the Chevron station on the verdict form for an apportionment of fault. Although the trial court initially questioned the validity of the Defendants' pretrial notices on the ground that the Defendants had not established the true legal owner of the Chevron station, it concluded that the notices were legally adequate. The trial court nevertheless determined that the Chevron station would not be on the verdict form because the Defendants failed to produce any evidence creating a jury question as to whether the Chevron station was responsible for any of the repairs or had knowledge of the existing condition of the fence.

Here, the trial court essentially granted Polite's motion for a directed verdict on the apportionment-of-fault issue with respect to the Chevron station.

> A directed verdict is authorized only where the evidence, with all reasonable deductions and construed in favor of the nonmovant, demands a particular verdict. OCGA § 9-11-50 (a). But where any evidence or some evidence exists to support a jury issue on the non-movant's claims, a directed verdict is improper. This Court conducts a de novo review on appeal from the grant of a directed verdict, and we will uphold a directed verdict only if all of the evidence demands it.

(Citations and punctuation omitted.) *Sun Nurseries, Inc. v. Lake Erma, LLC*, 316 Ga. App. 832, 835 (730 SE2d 556) (2012).

> (a) The apportionment-of-fault statute at issue, OCGA § 51-12-33,

> establishes the mechanism by which a trier of fact apportions damages. First, if the plaintiff is some degree responsible for its own injuries, the trier of fact determines the percentage of fault of the plaintiff, and the judge thereafter reduces the total amount of damages awarded in proportion to the plaintiff's percentage of fault. Next, in cases involving an action against more than one actor, the trier of fact apportions the remaining damages among the liable actors according to each actor's percentage of fault.

(Punctuation and footnotes omitted.) *Levine v. Suntrust Robinson Humphrey*, 321 Ga. App. 268, 271 (1) (740 SE2d 672) (2013). "In assessing percentages of fault, the trier of fact *shall* consider the fault of *all* persons or entities who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been,

7

named as a party to the suit." (Emphasis added.) OCGA § 51-12-33 (c). "The purpose of the apportionment statute is to have the jury consider all of the tortfeasors who may be liable to the plaintiff together, so their respective responsibilities for the harm can be determined. . . . By its plain language, OCGA § 51-12-33 (b) makes all persons responsible according to their respective percentages of responsibility." (Punctuation omitted.) *Couch v. Red Roof Inns, Inc.*, 291 Ga. 359, 365 (1) (729 SE2d 378) (2012).

In determining whether the Chevron station could be held liable to Polite, we look to applicable premises liability law. "[I]n Georgia, a proprietor has a statutory duty to exercise ordinary care to keep its premises safe, which includes inspecting the premises to discover possible dangerous conditions of which the proprietor does not have actual knowledge, and taking reasonable precautions to protect invitees from dangers foreseeable from the arrangement or use of the premises." (Punctuation and footnotes omitted.) *Benefield v. Tominich*, 308 Ga. App. 605, 607-608 (1) (708 SE2d 563) (2011). Proprietors also have a duty to protect customers from reasonably foreseeable criminal acts, and the question of reasonable foreseeability is generally for a jury to determine. See *Sturbridge Partners, Ltd. v. Walker*, 267 Ga. 785, 785-786 (482 SE 339) (1997). An incident causing an injury is not considered reasonably foreseeable unless it was substantially similar to prior criminal acts based on "the

8

location, nature and extent of the prior criminal activities and their likeness, proximity or other relationship to the crime in question." (Citations and punctuation omitted.) Id. at 786.

In this case, it is undisputed that: the Chevron station built the fence; the Defendants made repairs to it; the holes in the fence, which allowed easy access between Stonebridge Apartments and the Chevron station, were an ongoing issue; there was a hole in the fence as of January 2007, about five months prior to the attack on Polite; and many violent crimes and robberies had occurred on the Chevron gas station property during the same period that similar crimes occurred at Stonebridge Apartments. Additionally, there is evidence that the Defendants attempted to contact the owners of the Chevron station for the purpose of coming to some agreement to replace the wooden fence, and that the Chevron station owners were unresponsive. Furthermore, Polite testified that he was attacked after he walked through the fence and took a few steps, and the evidence shows that the wooden fence is on Chevron's property about 12 feet away from the Defendants' property line. Given this evidence, along with the fact that it is unknown whether the attackers came from the Chevron station or the apartment complex, a jury question exists as to whether the Chevron station should have anticipated another criminal attack near the wooden fence and

9

whether Chevron took reasonable precautions to protect Polite from the use of its premises. *Sturbridge Partners*, supra, 267 Ga. at 786-787 (holding evidence of prior burglaries was sufficient to give rise to a jury issue as to whether or not an apartment complex had the duty to exercise ordinary care to safeguard its tenants against the foreseeable risks posed by the prior burglaries). Under these circumstances, we cannot say that there was no evidence supporting the Defendants' claims that the Chevron gas station may have been liable for Polite's injuries and could be apportioned fault. Consequently, the trial court erred in refusing to allow the jury to consider whether the Chevron station was partially at fault.

The dissent reaches a contrary conclusion, contending that the Defendants were required to call witnesses in order to create factual questions as to the apportionment issue. Contrary to the dissent's assertion, this Court has held that, even where a defendant does not call witnesses, the plaintiff's own evidence may create questions of fact that preclude a directed verdict. See *Glover v. S. Bell Tel. & Telegraph Co.*, 132 Ga. App. 74, 78 (6) (207 SE2d 584) (1974). In arguing against Polite's motion for a directed verdict, the Defendants cited to the above evidence showing that a jury question existed as to the apportionment issue.

Additionally, the dissent's conclusion that the frequency of crimes in the area, including those at the Chevron station itself, "establishes nothing about what the owners or occupiers knew," ignores well-established legal precepts and views the evidence in a light most unfavorable to the Defendants, who were the nonmovants with respect to Polite's motion for a directed verdict. Notably, the evidence shows that there were armed robberies and assaults *inside* the convenience store, as well as in the parking lot and behind the building. Given that the incidents that occurred inside the store were reported to the police, as the dissent acknowledges, it strains credulity that the owners of the store were not aware of this criminal activity.

Nevertheless, a landowner "need not have actual knowledge of criminal conduct before it may be held liable for failing to keep the premises safe; rather a landowner can be liable for third-party criminal attacks if the landowner has reasonable grounds to apprehend that such a criminal act would be committed but fails to take steps to guard against injury." (Citation and punctuation omitted.) *Walker v. Aderhold Properties, Inc.*, 303 Ga. App. 710, 713 (1) (694 SE2d 119) (2010). One way to prove that a landowner had advance notice of the danger of criminal attack is by introducing evidence showing a pattern of substantially similar crimes on the premises. See *Fernandez v. Ga. Theatre Co. II*, 261 Ga. App. 892, 893 (583 SE2d

11

926) (2003) (providing that a proprietor's knowledge can be shown by evidence of substantially similar prior incidents of violence on its premises); *Hunter v. Cabe Group, Inc.*, 244 Ga. App. 162, 163 (535 SE2d 248) (2000) ("In order to prove that the owner had advance notice of the danger of such an assault, evidence is admissible to show a pattern of prior substantially similar criminal assaults on the premises creating a known dangerous condition for which the proprietor may be held liable.") (citations omitted).

Given the evidence showing numerous armed robberies and assaults on the Chevron property, including inside the convenience store, as well as evidence that the area surrounding the Chevron station and the apartment complex was known as a high-crime area, there is a factual question as to whether the Chevron station knew or should have known about the dangerous conditions on its premises which might subject it to a determination of fault. It was for the jury, not any member of this Court, to resolve this issue. Moreover, although it is not clear whether the Chevron station had any security protection, it is undisputed that it did not maintain its own fence, that the portion of the fence at issue was located on Chevron property about 12 feet away from the property line, and that this failure resulted in clear danger to those, such as Polite, who traversed openings in the fence.

12

Although the dissent wishes to uphold the jury's verdict, an apportionment of fault is required by law. Polite removed this issue from the jury's consideration by successfully moving for a directed verdict. Notwithstanding the substantial jury verdict, or this Court's desire to honor the jury's verdict, this Court cannot ignore the apportionment requirement. Nor can this Court overlook well-established law concerning a review of a directed verdict that mandates that we view the evidence most favorable to the nonmovant and that we reverse a directed verdict where, as here, a factual question exists that was not resolved by the jury. Since there is some evidence showing that Chevron station may have contributed to Polite's injuries, we are constrained to reverse the jury's verdict because the jury did not have the opportunity to consider whether the Chevron station should be apportioned fault.

(b) To the extent Polite argues that the Defendants failed to prove the exact identity of the owners of the Chevron station, his argument is unavailing.[2] In order

---

[2] Polite relies upon this Court's opinion in *Union Carbide Corp. v Fields*, 315 Ga. App. 554, 559 (1) (b) (ii) (726 SE2d 521) (2012) for the proposition that the fault of a nonparty cannot be considered for the purposes of apportioning damages without *some* competent evidence that the nonparty contributed to Polite's injury. Notwithstanding the fact that *Union Carbide* was reversed by *Georgia-Pacific, LLC v. Fields*, 293 Ga. 499 (748 SE2d 407) (2013), as discussed above, there is *some* evidence creating jury issue on the question of whether the Chevron contributed to Polite's injuries.

13

to submit the apportionment issue to the jury, the defending party must give pretrial notice that a nonparty was wholly or partially at fault. OCGA § 51-12-33 (d) (1). The notice "shall be given by filing a pleading in the action designating the nonparty and setting forth the nonparty's name and last known address, or *the best identification of the nonparty which is possible under the circumstances*, together with a brief statement of the basis for believing the nonparty to be at fault." (Emphasis supplied.) OCGA § 51-12-33 (d) (2). The statute does not require precise party identification. See *GFI Mgmt. Svcs., Inc. v. Medina*, 291 Ga. 741, 742-743 (733 SE2d 329) (2012) (unknown criminal assailants could be on the verdict form for apportionment of fault). Additionally, the determination of fault under OCGA § 51-12-33 does not subject a nonparty to liability in any action and cannot be introduced as evidence of liability in any action. OCGA § 51-12-33 (f). Consequently, although establishing the exact identity of the Chevron station owner would be necessary to subject that owner to liability, to apportion fault, the Defendants were required, at a minimum, to designate the nonparty's identification as much they could under the circumstances. OCGA § 51-12-33 (d). The trial court found that the Defendants' apportionment notices were adequate, and Polite presents no basis to reverse that ruling.

14

Finally, we note that the Defendants have a burden to establish a rational basis for apportioning fault to a nonparty, see *Couch*, supra, 291 Ga. at 366 (1); *Levine*, supra, 321 Ga. App. at 272 (1). Whether the Defendants' would have met that burden given the trial evidence presented should have been left for the jury to determine. See *Couch*, supra, 291 Ga. at 366 (1). Accordingly, the trial court erred by taking that issue away from the jury and completely omitting the Chevron station from the verdict form.

2. The Defendants also contend that the trial court erred in its charge to the jury on proximate cause because it is inconsistent with the statutory requirement that the jury apportion fault to all persons responsible for the plaintiff's injuries. We disagree.

The review of allegedly erroneous jury instructions is a legal question, and we therefore review the trial court's ruling de novo. *Monitronics Int'l, Inc. v. Veasley*, 323 Ga. App. 126, 140 (5) (746 SE2d 793) (2013). "[I]t is well established that jury instructions must be read and considered as a whole in determining whether the charge contained error." (Citation and punctuation omitted.) *West v. Breast Care Specialists, LLC*, 290 Ga. App. 521, 522 (1) (659 SE2d 895) (2008).

Over the Defendants' objection, the trial court gave the following instruction on proximate cause:

15

Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred. Proximate cause is that which is nearest in the order of responsible causes, as distinguished from remote. That which stands last in causation, not necessarily in time or place, but in causal relation.

If an injury would have occurred regardless of the acts on negligence of the part of the Defendant, there can be no recovery. In determining whether Plaintiff has met his burden of proving that a Defendant's negligence was the proximate cause of his injuries, you need not address the various elements of it in any particular order. There may be more than one proximate cause of an injury.

A general principle of law is that one wrongdoer may be liable for the acts of a later wrongdoer if the first could have foreseen the wrongful acts of the second. If, after an original wrongful act, a new act has intervened that, by itself, could have been the cause of the injury, and the nature of the new act was such that its natural consequences could reasonably have been foreseen by the original wrongdoer, the original wrongdoer is responsible for all of the consequences resulting from the intervening act.

As discussed in Division 1, a property owner has a duty to keep his premises safe from foreseeable criminal acts. The proximate cause charge reflects this principle by stating that "one wrongdoer may be liable for the acts of a later wrongdoer if the first could have foreseen the wrongful acts of the second." While the proximate cause instruction also stated that the original wrongdoer is responsible for all of the

16

consequences resulting from the intervening act, it does not expressly provide that such wrongdoer is completely or totally liable for all of the plaintiff's damages. Indeed, the fact that a property owner may be liable for failing to keep the premises safe from foreseeable criminal acts does contradict the requirement that damages are to be apportioned. See *Couch*, supra, 291 Ga. at 366 (1) (holding that even under the apportionment statute, a property owner must still keep his premises safe or face potential liability in proportion to his level of responsibility for causing the plaintiff's injuries from failing to protect against a criminal attack). The trial court correctly instructed the jury on the issue of apportionment of fault and did not err in giving the proximate cause instruction.

3. The Defendants' remaining claims of error are based on evidence admitted at trial, are not likely to recur during retrial of the case, or are moot in light of our holding in Division 1.

*Judgment reversed. Andrews, P.J., Dillard and McMillian, JJ., concur. Doyle, P.J., and Ray, J., concur fully in Divisions 1 and 3 and concur in judgment only in Division 2. Barnes, P.J., concurs fully in Division 2 and dissents in Division 1.*

17

A13A2134. DOUBLE VIEW VENTURES, LLC et al. v. POLITE.

BARNES, Presiding Judge, concurring in part and dissenting in part.

Because the trial court did not err in denying the defendants' motion for new trial in this premises liability suit, I must respectfully dissent from Division 1 of the majority opinion, although I concur fully in Division 2. The owner and property manager of the apartment complex where Polite was attacked contend that the trial court should have allowed the jury to consider apportioning damages against a contiguous property owner, asserting that OCGA § 51-12-33 only requires them to give timely notice of the nonparty they wish to add to the verdict form. But the defendants failed to introduce evidence that would provide a rational basis for the jury to apportion fault against this nonparty under a premises liability theory. Accordingly, I respectfully dissent to the majority opinion reversing the verdict and judgment in this case.

"In a premises liability case in which the jury determines a defendant property owner negligently failed to prevent a foreseeable criminal attack, . . . the jury is allowed to apportion damages among the property owner and the criminal assailant," pursuant to OCGA § 51-12-33. *Couch v. Red Roof Inns*, 291 Ga. 359 (1) (729 SE2d 378 (2012). Whether the assailant's identity is known is not important, because the

assailant is undeniably part of "the full universe of tortfeasors, whether part[y] or not," which the jury is authorized to find liable for the plaintiff's damages and against which it may apportion a damages award. Id. at 361. The issue in this case is different: what evidence is required to elevate a nonparty who is not a criminal actor to inclusion in "the full universe of tortfeasors" against which damages may be apportioned?

The defendants filed a "Notice of Negligence or Fault of Nonparty" pursuant to OCGA § 51-12-33 against three entities. In one notice they asserted that Polite was attacked on the property of a Chevron-branded gas station and convenience store, and believed that Chevron USA, Inc. had "ownership and/or management interests in the gas station and convenience store" believed to be doing business as Shreeji Food Mart. In the second notice the defendants claimed that Polite was attacked "on property owned and/or operated by AMA Investment, Inc.," which operated a Chevron-branded gas station and convenience store doing business as Shreeji Food Mart and the third notice was identical except for the nonparty name, which was Areesha Enterprises, LLC. In all three notices, the defendants contended that

> the negligence of [the named nonparty's] knowledge of and continued
> maintenance of a nuisance on its property were the proximate cause of
> [the] Plaintiff's injuries. [The named nonparty] has failed to repair a

2

fence located on its property. This lack of repair constitutes negligence and nuisance that is the proximate cause of Plaintiff's injuries.

After Polite rested his case, the defendants also rested without putting up any evidence, and Polite moved for a directed verdict as to any apportionment of fault against AMA Investments, Areesha Properties, and Chevron U.S.A. on several grounds. Those grounds included the lack of evidence regarding the relationship between the convenience store and the three parties and that there was no evidence that the property owners knew about ongoing criminal activity behind the store so that the attack on Polite was foreseeable. Polite also argued that because a convenience store would not want to restrict access in the way the apartment owners wanted to restrict non-residents' access, the defendants needed to present evidence regarding what security measures a convenience store should employ. The defendants responded that Polite's security expert testified that commercial property owners had a duty to protect their customers and that there had been a robbery inside that store, which was sufficient evidence to allow the jury to decide if the property owner had sufficient knowledge. Further, they argued that apportioning damages was "not the same as a claim" and they did not have to establish damages. The statute only required notice about who the defendant intended to blame, and it did not matter who

3

actually owned the property or which entity's name was listed in the apportionment section of the verdict, because the verdict was not binding against the nonparty.

The trial court asked, "Do you think the Legislature actually intended that? Because if that's the case, what would keep you from theoretically naming a thousand entities?" The defendants responded, "Well, you could. That's exactly right. If there were a thousand entities that you could establish and articulate were in some way responsible for[.] " The defendants only had to establish that there is some other entity that was responsible, and not who that entity actually was, they contended, and suggested that the trial court simply identify the nonparty as "Chevron" because "[t]here is a sign on the door that says Chevron." After additional colloquy, the trial court found that the defendants failed to produce sufficient evidence related to the three nonparties and did not include them on the verdict form.

The defendants argue on appeal as they did at trial that the only requirement for adding a nonparty for apportionment purposes under OCGA § 51-12-33 is that they give timely notice that they believe the nonparty was wholly or partially at fault, because "the requirements for maintaining a claim against, and recovering from an entity do not apply." It does not matter, according to the defendants, whether a contiguous property owner is actually identified properly, because the entity named

4

is not subject to liability if the jury assesses fault against them. Nor do they bear the burden of proving the extent of the nonparty's responsibility for the plaintiff's damages, they argue, because the statute provides that the nonparty against whom fault is claims must be considered regardless of whether the person or entity was, or could have been, named as a party to the suit. Aside from the ownership issue, the defendants also argue that there was sufficient evidence for the jury to consider whether the nonparty had adequate notice of crimes occurring on the property to be found responsible for a portion of Polite's damages.

The trial court was correct in holding that the defendants did not produce sufficient evidence to create a jury question regarding whether damages should be apportioned against the nonparties. Property owners in premises liability cases involving criminal activity "face potential liability for an amount of damages *commensurate with [their] responsibility* for a plaintiff's harm." (Emphasis supplied.) *Couch*, 291 Ga. at 366. Further, "it is the defendant's burden to establish a rational basis for apportioning fault to a nonparty." *Levine v. SunTrust Robinson Humphrey*, 321 Ga. App. 268, 272 (1) (740 SE2d 672) (2013).

> [T]he fault of a nonparty cannot be considered for the purposes of apportioning damages without some competent evidence that the nonparty in fact contributed to the alleged injury or damages.... If it were

5

otherwise, ... there would be no limitation on the number of potential nonparties that a trial court would be required to include on the verdict form for purposes of assessing fault under OCGA § 51-12-33 (c).

(Citation and punctuation omitted.) *Union Carbide Corp. v. Fields*, 315 Ga. App. 554, 560 (b) (ii) (726 SE2d 521) (2012), reversed on other grounds, *Georgia-Pacific v. Fields*, 293 Ga. 499 (748 SE2d 407) (2013). Accordingly, a defendant property owner who wants the jury to allocate responsibility for a plaintiff's injury to another property owner has to present evidence sufficient to provide a rational basis for the jury to apportion damages against it. The defendants in this case did not do so.

Pretermitting whether a defendant must identify the legal owner or occupier of adjoining land for apportionment purposes, the applicable standard for adding a nonparty for apportionment purposes is that a defendant must at a minimum present evidence that the nonparty had a duty to the plaintiff, breached its duty, and caused damages. While the defendants baldly assert that "there was ample evidence that the owner/occupier of the Chevron station owed a duty, breached its duty, and was a cause of Polite's injuries," there was no actual admissible evidence introduced by the defendants at trial that could form a *rational basis* for the jury to apportion damages against "Chevron."

6

Further, a landowner has a duty to prevent foreseeable crimes, and the defendants argue that there was evidence that "Chevron" was aware of criminal activity in this area because Polite's security expert testified that a number of crimes had occurred in the previous three years at the address where the Chevron station and a food mart were located. But the expert obtained that information by reviewing 911 call logs and then asking for incident reports on calls from the address where the station was located, from the defendant apartments, and from an adjoining apartment complex. He did not obtain the information from the "Chevron" owners or occupiers, and therefore this evidence establishes nothing about what the owners or occupiers knew. Further, testimony from the defendants' former property manager that she left messages for the property owner and kept "hoping and waiting for the owner to contact [her]" does not establish that the Chevron owners or occupiers even received her messages. Finally, while Polite's expert admitted on cross-examination that "Chevron" had an obligation to control crime on their property, he also testified that he had no information on what kind of security program was used there.

Absent information about the contiguous landowner/occupier's knowledge of similar crimes, the foreseeability of this crime, or the security efforts in use on that property, if any, the jury had no rational basis to consider whether Polite's damages

should have been apportioned against that nonparty, and the trial court did not err in declining to allow the jury to do so. *McReynolds v. Krebs*, 307 Ga. App. 330, 335 (3) (705 SE2d 214) (2010), aff'd 290 Ga. 850 (725 SE2d 584) (2012) (trial court properly declined to allow jury to consider apportioning damages against nonparty after defendant presented no evidence on which apportionment of liability could be based, but "rested following the plaintiff's case without presenting any evidence whatsoever.").

Accordingly, because the defendants failed to present evidence that would have provided the jury with a rational basis for apportioning damages against the contiguous property owner, I must respectfully dissent from Division 1 of the majority opinion.

2. As noted earlier, I fully concur with all that is said in Division 2 of the majority opinion, which concludes that the trial court did not err in its jury instructions on apportionment of fault and proximate cause.

3. The defendants also argue that the trial court erred in denying their motion for new trial on the general grounds, contending that the jury's failure to apportion any fault to the criminals who attacked the plaintiff "is plainly both contrary to the evidence and not supported by any evidence." They further argue that the trial court

failed to exercise its discretion to act as a "thirteenth juror" as permitted by OCGA § 5-5-20.

a. In asserting that the jury's decision to apportion zero fault to the criminal nonparties is contrary to the evidence, the defendants are basically arguing that OCGA § 51-12-33 *requires* a jury to apportion at least some percentage of fault against a nonparty criminal in this kind of premises liability case. The statute itself contains no such requirement. In addressing the argument that allowing jury to apportion fault to a nonparty criminal actor would insulate the landowner from liability, our Supreme Court observed that "property owners remain responsible for their actions and will be required to pay damages in proportion to their level of responsibility." *Couch*, 291 Ga. at 366 (1).

A finding that the criminals were at fault to some unspecified degree is not mandated by the evidence. Polite introduced evidence from which a jury could find that three similar attacks had occurred in the month before Polite was shot, that the defendants failed to give residents proper notice of the attacks, that the defendants' own employees told management that the path was dangerous, that the defendants chose to incorporate the wooden fence into their perimeter fencing instead of continuing their wrought iron fence, that they installed an opaque wooden gate in the

9

fence, and that they invited use of the path by clearing it of vegetation. "[A] jury verdict, after approval by the trial court, and the judgment thereon will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law." (Punctuation and footnote omitted.) *Bldg. Materials Wholesale v. Triad Drywall*, 287 Ga. App. 772, 774 (1) (653 SE2d 115) (2007).

Additionally, "[a]n appellant cannot travel on one ground below, find the wind blowing in another direction, change tack, and head elsewhere on appeal." *Boggs v. Madison County*, 240 Ga. App. 849, 852 (524 SE2d 252) (1999). The defendants made no exceptions to the charge after the trial court, while instructing the jury on how to complete the apportionment section of the verdict form, informed it that if it deemed "any of these parties or nonparties to have zero percent [fault], go ahead and write the zero instead of leaving it blank." Having failed to interpose any objection at trial to the verdict form or the trial court's instructions, the defendants cannot now complain that the trial court should have done something different. *Lummus v. State*, 274 Ga. App. 636, 637 (1) (618 SE2d 692) (2005) ("defendant cannot acquiesce in a trial court's ruling below and then complain about that ruling on appeal.")

b. Further, there is no merit to the defendants' argument that the trial court failed to exercise its discretion to act as a thirteenth juror, as authorized by OCGA §

10

5-5-20. In upon the general grounds of a motion for a new trial, "this court will not disturb the trial court's refusal to grant new trial if there is any evidence to support the judgment." *Hopkins v. Sicro*, 107 Ga. App. 691, 693 (2) (131 SE2d 243) (1963). However, if

> a defendant raises a claim under OCGA §§ 5-5-20 and 5-5-21 in his motion for new trial, the law imposes upon the trial court an affirmative duty to exercise its discretion and weigh the evidence to determine whether a new trial is warranted. If the record reflects that the trial court failed to exercise its discretion and sit as the thirteenth juror, we will vacate and remand for the trial court to fulfill its affirmative statutory duty.

(Citations omitted.) *Hartley v. State*, 299 Ga. App. 534, 540 (3) (683 SE2d 109) (2009).

The defendants contend that the trial court only reviewed their legal errors, rather than exercising its discretion to determine whether the jury's verdict was contrary to the evidence, and therefore its order denying their motion for a new trial should be vacated and the case remanded with direction for consideration under the proper legal standard. The defendants do not point to anything in the record that indicates that the trial court applied an incorrect standard of review, however.

11

Generally, in interpreting the language of an order overruling a motion for a new trial, it must be presumed that the trial judge knew the rule as to the obligation thus devolving upon him, and that in overruling the motion he did exercise this discretion, unless the language of the order indicates to the contrary and that the court agreed to the verdict against his own judgment and against the dictates of his own conscience, merely because he did not feel that he had the duty or authority to override the findings of the jury upon disputed issues of fact.

(Citation and punctuation omitted.) *Copeland v. State*, ___ Ga. App. ___ (Case Number A13A2070, decided February 6, 2014); see also *Brown v. Service Coach Lines*, 71 Ga. App. 437, 443 (1) (31 SE2d 236) (1944).

4. Finally, the trial court did not abuse its discretion in sustaining Polite's objection to the defendants' admission in evidence of character evidence, asserting that Polite opened the door to the introduction of this evidence when he "presented himself as a clean cut young man with a difficult upbringing."

Former OCGA § 24-2-2 provided that "[t]he general character of the parties and especially their conduct in other transactions are irrelevant matter unless the nature of the action involves such character and renders necessary or proper the

12

investigation of such conduct."[1] The defendants argue that Polite intentionally elected to put his character into evidence through testimony from a friend of Polite's mother who described Polite as a role model and mentor to her teenage son, who improved his reading skills after Polite encouraged him to write down lyrics to songs he was composing. The defendants further argue that Polite

> was described as a role model and mentor. That testimony opened the door to a more complete, accurate portrayal of Polite via his rap lyrics, web postings, and numerous photographs. The damages in this case are based largely on the impact of the injury on his daily life. The jury, however, never saw or heard evidence of Polite['s] *real* daily life before the shooting.

The defendants do not state precisely what character evidence they think the trial court should have admitted, although at trial they proffered photographs. At the hearing on Polite's motion in limine regarding this evidence, Polite says the photographs of him "looking criminal and thuggish and gang" had been placed on his My Space page to promote his rap music and record labels but argued that no evidence existed that he was actually a gang member. In addition to being irrelevant,

---

[1] Former OCGA § 24-2-2 "was superseded by OCGA § 24-4-404." *Johnson v. State*, 293 Ga. 641, 644 (6), n. 3 (748 SE2d 896) (2013) (citation omitted), but because this case was tried before January 1, 2013, our new Evidence Code did not apply. See Ga. L. 2011, pp. 99, 214, § 101.

13

Polite argued that the photographs were more prejudicial than probative. The trial court granted the motion in limine.

After the friend of Polite's mother testified, the defendants renewed their attempt to introduce evidence of "what his character was at the time" before he was shot, arguing that the witness had been "making [Polite] look like a choir boy" while the defense had pictures of him holding guns and "acting like he's breaking into apartments," the lyrics to his rap music were offensive, he had been in jail for DUI, and he had pled guilty to offenses that were not crimes of moral turpitude. The trial court held that the witness's testimony about Polite helping her son was collateral to any of the main issues in the case.

"[A] trial court has discretion to exclude evidence when its probative value is outweighed by the undue sympathy, hostility, or prejudice its admission might generate with the jury." (Citation and punctuation omitted.) *Kesterson v. Jarrett*, 291 Ga. 380, 387 (2) (b) (728 SE2d 557) (2012). There was no evidence that Polite was actually in a gang. In fact, in support of his motion in limine Polite introduced an affidavit from a detective who was the supervisor of the DeKalb County Gang Unit. The detective interviewed Polite and reviewed the police file on the assault, deposition testimony from two security guards, Polite, and Polite's friend,

photographs of the crime scene, and individual and group photographs from Polite's My Space page, and he concluded that Polite was not affiliated with any gang, his attack was not gang-related, the photographs of Polite do not indicate he is in a gang, and that it was unlikely that a gang member would attack Polite based on a mistaken belief he was in a gang. The detective explained why he reached all of these conclusions, and stated that "any suggestion that Nathan Polite is affiliated with a gang appears to be a mistake in confusing a music or rap group with a gang." The defendants have not cited to any evidence that Polite had committed gun crimes or broken into any apartments, so the trial court was entitled to find that photographs of him "acting" in support of his rap persona would be particularly prejudicial. Therefore, the trial court did not abuse its discretion in finding the prejudicial effect of the character evidence the defendants sought to introduce outweighed its probative value.

For these reasons, I would affirm the judgment entered on the jury verdict in this case, and therefore I respectfully dissent in part and concur in part to the majority opinion.