**November 20, 2015**

# In the Court of Appeals of Georgia

A15A0828. A15A0829. SIX FLAGS OVER GEORGIA II L.P. et al.
     v. MARTIN; and vice versa.

DILLARD, Judge.

In Case No. A15A0828, Six Flags Over Georgia II, L.P. ("Six Flags") appeals a jury verdict in favor of Joshua Martin, who sued Six Flags under a premises-liability theory after sustaining serious injuries when he was viciously attacked by gang members at a nearby bus stop that he used to access its park. On appeal, Six Flags argues that the jury's verdict must be reversed because the attack on Martin occurred outside of its "premises and approaches" as defined in OCGA § 51-3-1, there was insufficient evidence to show that Six Flags's negligence was the proximate cause of Martin's injuries, and the trial court erred by denying its request to include some of Martin's assailants on the verdict form for apportionment of fault. Martin cross-

appeals, in Case No. A15A0829, arguing that the trial court erred by failing to give one of his requested jury instructions and by denying his request to enter judgment against Six Flags as of the verdict date, which deprived him of post-judgment interest. For the reasons set forth *infra*, we hold that the evidence was sufficient to support the jury's verdict, but we nevertheless reverse the verdict and remand the case for a new trial because the trial court erred in denying Six Flags's apportionment request. And because this case must be retried, we dismiss Martin's cross-appeal as moot.

Viewing the evidence with every inference and presumption in favor of upholding the verdict,[1] the record shows that Six Flags is located in a well-known, high-crime area, which has been the site of numerous instances of criminal gang activity. Six Flags was aware of criminal gang activity within its park, and among its employees, but discouraged its employees from discussing the issue. Indeed, in the years preceding Martin's attack, there had been instances of criminal activity inside the park that "spilled over" to outside the park. Eddie Herman, a former Cobb County police officer who worked closely with Six Flags for almost 30 years, testified that the risk of criminal activity was greatest at closing time when Six Flags's customers

---

[1] *Quay v. Heritage Fin., Inc.*, 274 Ga. App. 358, 363 (4) (617 SE2d 618) (2005) (punctuation omitted).

were funneled into parking lots and nearby bus stops, which he described as "hot spots." Nevertheless, Six Flags invited its customers to use nearby bus stops, including the Cobb County Transit ("CCT") bus stop, and considered the stops good for business.

On July 3, 2007, a Tuesday, Martin went to Six Flags to celebrate a friend's acceptance to college. Sometime that same day, unbeknownst to Martin, several gang members (who would later attack him), including at least one Six Flags employee, accosted and threatened two families inside the Six Flags park and in its parking lot. Specifically, approximately one hour before the park closed, the Tapp and Queen families were near a park ride, when gang members ran toward a five-year-old child. John Tapp grabbed one of the gang members to stop him from running over the child, and another gang member became angry and tried to strike Tapp from behind. When Eric Queen intervened, the gang circled Tapp and Queen, coming "nose to nose" with and threatening to "beat the shit out of" them. After Six Flags security guards approached, the gang members backed off and walked away. As they were walking away, the gang members threatened to "get" Queen and Tapp in the parking lot. Queen and Tapp reported the incident to Six Flags security, giving a physical description of the gang members.

3

At closing time, the Tapp and Queen families were leaving the park when they saw a group of approximately 40 men gathered around and looking toward the gate. The men were wearing similar clothing and included the same gang members who had earlier threatened them. After security guards followed the gang members out of the park gates and returned to the park, the Tapps and Queens exited the gates, believing it was safe for them to do so. Instead, they immediately saw the gang of 40 to 50 men blocking the sidewalk. And unable to return to the park, the Tapps and Queens tried to blend in with the crowd to avoid being noticed by the gang members who had threatened them. The two families were nonetheless spotted and someone yelled, "drop the hammer," which Tapp understood to mean that the group had a gun. The Tapp and Queen families hurried to their cars and were able to escape without incident.

Shortly before 9:00 p.m., the park's closing time, Martin, along with friends, walked down Six Flags Parkway to South Service Road past the CCT bus stop and then down South Service Road to a nearby hotel to use the restroom. But by the time Martin and his friends returned to the bus stop, they had missed the 9:00 p.m. bus. To wait for the next bus, Martin and his friends walked back down Six Flags Parkway toward the park and sat on a rail near the park entrance.

4

After seeing a large group of people in the area (all wearing similar t-shirts), Martin and his friends left the rail and walked away from the park back down Six Flags Parkway to the CCT bus stop where they waited for the bus. At this point, the group of gang members, including those that had accosted the Tapp and Queen families, turned their sights on Martin and his friends. Without any provocation, Martin was hit with brass knuckles and knocked to the ground. Martin attempted to escape, but he was repeatedly stomped on by various gang members, which caused him permanent and severe brain damage.

Thereafter, Martin sued Six Flags under a premises-liability theory, alleging that it was liable for his injuries under OCGA § 51-3-1 for failing to exercise ordinary care to keep the park premises and approaches safe for him as its invitee. After a trial, the jury issued a verdict in favor of Martin and awarded him $35,000,000 in damages. And because the jury apportioned 8 percent of the fault to the four individuals who had criminal convictions related to Martin's attack and 92 percent to Six Flags, the trial court entered judgment against Six Flags in the amount of $32,200,000, plus $541,093.12 for prejudgment interest, as well as court costs and post-judgment interest. This appeal by Six Flags follows.

At the outset, we note that when a jury returns a verdict and it has the approval of the trial judge, "the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence."[2] Indeed, we are charged with construing "the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even when the evidence is in conflict."[3] Bearing these guiding principles in mind, we turn now to Six Flags's specific claims of error.

1. Six Flags first argues that the jury's verdict was unsupported by the evidence because the bus stop where Martin was attacked was not, as a matter of law, part of its "premises or approaches" within the meaning of OCGA § 51-3-1. We disagree.

Our analysis necessarily begins with the text of OCGA § 51-3-1, which provides that "[w]here an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." And our Supreme Court has interpreted

---

[2] *Quay*, 274 Ga. App. at 362 (4).

[3] *Id.* at 363 (4) (punctuation omitted).

6

this statutory text as imposing "a duty on a landowner regarding approaches to his premises that are public ways to exercise due care within the limited confines of his right in the public way, notwithstanding the landowner's lack of control over that public way approach."[4] Furthermore, the term "approaches," as used in OCGA § 51-3-1, has been construed to mean

> that property directly contiguous, adjacent to, and touching those entryways to premises under the control of an owner or occupier of land, through which the owner or occupier, by express or implied invitation, has induced or led others to come upon his premises for any lawful purpose, and through which such owner or occupier could foresee a reasonable invitee would find it necessary or convenient to traverse while entering or exiting in the course of the business for which the invitation was extended.[5]

And property that is "contiguous, adjacent to, and touching" means "property within the last few steps taken by invitees, as opposed to 'mere pedestrians,' as they enter

---

[4] *Motel Props., Inc. v. Miller*, 263 Ga. 484, 485 (1) (436 SE2d 196) (1993), *citing Todd v. F.W. Woolworth Co.*, 258 Ga. 194, 197 (1) (366 SE2d 674) (1988).

[5] *Motel Props., Inc*, 263 Ga. at 486 (3).

7

or exit the premises."[6] Finally, what constitutes an approach to certain premises is "a question with both factual and legal connotations."[7]

Here, the evidence shows that the attack on Martin occurred at the CCT bus stop, which is located at the intersection of two public streets—Six Flags Parkway and South Service Road—in an area that is not "contiguous, adjacent to, or touching" Six Flags's premises. As a result, the CCT bus stop does not meet the Supreme Court of Georgia's *general* definition of an "approach," as outlined *supra*. Nevertheless, our Supreme Court has recognized that there are exceptions to this general definition of an approach.[8] Indeed, under certain circumstances "non-contiguous property can be deemed an approach because the landowner extended the approach to his premises by some *positive* action on his part, such as constructing a sidewalk, ramp, or other

[6] *Id.* (citation and punctuation omitted).

[7] *See Motel Props., Inc*, 263 Ga. at 485 (1) (referring to "what physically constitutes an approach" as a "factual question"); *Todd*, 258 Ga. at 196 (1) ("What constitutes an approach to certain premises is a question with both factual and legal connotations."); *Combs v. Atlanta Auto Auction, Inc*., 287 Ga. App. 9, 15 (4) (650 SE2d 709) (2007) (same).

[8] *Motel Props., Inc*, 263 Ga. at 486 (3).

8

*direct* approach."[9] And this exception is premised on the fact that "the owner or occupier of land, *for his own particular benefit*, has affirmatively exerted control over a public way or another's property."[10]

In the case *sub judice*, there was evidence that public transportation has not always serviced Six Flags, and that it was "good for business" when the CCT bus stop and a MARTA station were finally able to service the theme park's customers and employees. Indeed, Six Flags expressly *invited* its customers, via its website, to use the CCT buses, and the park constructed barricades and erected signs directing its customers along Six Flags Parkway leading to the CCT bus stop. In addition, Six Flags sent its own security staff, and even employed off-duty Cobb County officers, to aid on-duty Cobb County police in directing traffic in the public ways leading to the park. There was also evidence that these affirmative actions by Six Flags to exert

---

[9] *Id.* (punctuation omitted); *accord Rischack v. City of Perry*, 223 Ga. App. 856, 858 (1) (479 SE2d 163) (1996); *see Elmore of Embry Hills, Inc. v. Porcher*, 124 Ga. App. 418, 420 (183 SE2d 923) (1971) (noting that a landowner might "extend the 'approach' to his premises beyond the limits thereof by some positive action on his part and for his negligence in keeping same in safe condition he would be liable").

[10] *Motel Props., Inc*, 263 Ga. at 486 (3) (emphasis supplied).

control over the public way between the park and the CCT bus stop were *solely* for Six Flags's benefit.[11]

Specifically, a Six Flags representative testified as follows:

Q. And there's no other business to go to. Once you get to South Service Road, if you're going anywhere, you're going into the park; right?

A. Yes.

. . .

Q. From as far back as you can remember, Six Flags has been using this corridor as its final approach to the park; correct?

A. Well, that's because . . . the MARTA bus and the CCT bus are located there.

Q. Right. So when people get off the bus, this is the final approach to the park; right?

A. Yes.

. . .

---

[11] *See id.*(noting that the exception to the general definition of approach is "based on the fact that the owner or occupier of land, for *his own particular benefit*, has affirmatively exerted control over a public way or another's property" (emphasis supplied)); *Combs*, 287 Ga. App. at 16 (4) (noting that, in considering whether a public way constitutes an approach to a landowner's property, "we consider what kinds of rights the property owner has in the public way, including whether *he has appropriated it for his own benefit*, using it for some purpose other than a public way" (emphasis supplied)).

Q. When folks come out of here and approach the park, they've got nowhere else to go but the park; right?

A. That's correct.

Q. And . . . for years Six Flags has been taking care of that stretch of roadway, sidewalk, curb, all that area; right?

A. Yes.[12]

While the determination of whether certain property constitutes an "approach" within the meaning of OCGA § 51-3-1 is a question of law *and* fact,[13] a review of Georgia's case law on this issue shows that making such a determination often heavily depends on the unique facts and circumstances of each individual case. Indeed, we have previously acknowledged that ascertaining exactly what constitutes an "approach" can be "complex and bothersome" and difficult to define;[14] and this

---

[12] Although Six Flags argues that there was also evidence that the bus stop serviced nearby hotels, we must view the evidence in a light most favorable to the jury's verdict. *See supra* footnotes 2-3 and accompanying text.

[13] *See Motel Props., Inc*, 263 Ga. at 485 (1) (referring to "what physically constitutes an approach" as a "factual question"); *Todd*, 258 Ga. at 196 (1) ("What constitutes an approach to certain premises is a question with both factual and legal connotations."); *Combs*, 287 Ga. App. at 15 (4) (same).

[14] *See Elmore of Embry Hills, Inc*, 124 Ga. App. at 419.

11

case only serves to reinforce our prior sentiments about this thorny aspect of our jurisprudence.

The dissent concludes that the CCT bus stop is not an approach to Six Flags's property *as a matter of law* because, even assuming there was evidence that Six Flags "took positive action to exercise rights to control pedestrian and vehicular traffic in those public ways and to physically maintain those public ways as an approach to the park, this is not evidence that Six Flags had or exercised any right to control security against a criminal attack in those public ways." However, the dissent points to no evidence that Six Flags *lacked* a right to work with Cobb County to provide security for that area, and it acknowledges that there *was* evidence that the Six Flags's security team and other employees worked with Cobb County police in at least some respects in that particular area—such as directing traffic and pedestrians as they traveled between the park's entrance and the areas where the MARTA station and CCT bus stop were located.

And regardless, there was evidence that Cobb County police not only allowed, but even requested that Six Flags provide security in the area surrounding the CCT bus stop. As previously noted, Officer Herman, who had worked with Six Flags for years, testified that the risk of criminal activity was greatest at closing time when Six

12

Flags's customers were funneled into parking lots and nearby bus stops, which he described as "hot spots." And even though Officer Herman *repeatedly* advised Six Flags to provide security in these "hot spots" during all operating hours, Six Flags declined to do so on weekdays, citing budgetary restrictions. It can be reasonably inferred from this testimony, then, that Six Flags could afford to and did provide security in those "hot spot" areas at least on the weekend.

As further evidence of Six Flags's ability to control the area where Martin was attacked, another Six Flags representative testified that the park "had liberties over there since . . . 1967" and that it had "never really been an issue as far as having to go to the county and file a sign permit or any of those type of issues." The dissent brushes this testimony aside, emphasizing that Cobb County, not Six Flags, had the duty to provide police protection in the public way where the attack occurred. Similarly, Six Flags asserts that, regardless of whether certain off-duty officers on Six Flags's payroll also patrolled the area, undisputed evidence shows that on-duty County police regularly patrolled the area and MARTA police had a regular presence near the bus stop where Martin was attacked. But Cobb County's duty to provide police protection in this public way in no way precludes a jury from finding that Six Flags, nevertheless, exercised control over the same property for its own benefit.

13

Indeed, we have previously held that whether an owner and a non-owner *both* controlled the owner's property is a factual question for the jury.[15] To hold otherwise would render the exception to the general definition of an approach—*i.e.*, extending an approach by exerting control over the property of another—utterly meaningless. Suffice it to say, this is something we may not do.[16]

Instead, we are duty bound to follow the well-established precedent of both this Court and our Supreme Court in this particular area of our jurisprudence. And the most analogous application of the exception to the general definition of an approach is in *Combs v. Atlanta Auto Auction, Inc.*,[17] where this Court noted that, although the proximity to the owner's property is perhaps the most important circumstance in

---

[15] *See Williams v. Nico Indus., Inc.*, 157 Ga. App. 814, (278 SE2d 677) (1981), *disapproved of on other grounds by Malvarez v. Ga. Power Co.*, 250 Ga. 568 (300 SE2d 145) (1983) (holding that a "substantial fact issue" existed regarding whether the property owner or a general contractor or both were in control of the premises); *see also Scheer v. Cliatt*, 133 Ga. App. 702, 704 (a) (212 SE2d 29) (1975) (noting that "[w]hether a particular appurtenance or instrumentality is under the control of an owner or occupant is usually a question of fact").

[16] *See Motel Props., Inc*, 263 Ga. at 486 (3) (adopting the exception to the general definition of an approach under OCGA § 51-3-1); *Whorton v. State*, 321 Ga. App. 335, 339 (741 SE2d 653) (2013) (noting that "vertical stare decisis dictates that we faithfully adhere to the precedents established by the Supreme Court of Georgia . . .").

[17] 287 Ga. App. 9 (650 SE2d 709) (2007).

14

determining what constitutes an approach to that property, it is "[a]lso important . . . whether the alleged approach, although part of a public way, is used *primarily or exclusively by those attempting to access the landowner's premises* (i.e., whether the approach is used primarily by invitees of the landowner as opposed to the public at large)."[18] In addition, this Court considers "what kinds of rights the property owner has in the public way, including whether he has *appropriated it for his own benefit*"[19] and whether the property owner "induced or led" its patrons to use the area.[20]

In *Combs*, two children were tragically killed when a train hit their car on a railroad crossing approximately 25 feet from the defendant's commercial property, and the children's mother sued the property owner under a premises-liability theory.[21] The accident occurred on a short, unimproved road that serviced *only* the defendant's business, and it appeared that "the road's sole function [was] to facilitate the business operations of [the defendant]."[22] Furthermore, the property owner admittedly used the

---

[18] *Id.* at 15 (4) (emphasis supplied).

[19] *Id.* at 15-16 (4) (emphasis supplied).

[20] *Id.* at 16 (4).

[21] *See id.* at 9.

[22] *See id.* at 9, 16 (4).

road as a "receiving area—i.e., for purposes other than a public roadway."[23] In addition, although there was an alternative entrance to the business, the plaintiff was instructed to use the road with the railroad crossing, which demonstrated that the property owner "clearly induced or led" her to use a particular entrance and made it reasonably foreseeable that she would find it necessary to cross the railroad tracks to access the property.[24] Under these particular circumstances, we held that, at the very least, the portion of the road where the railroad crossing was located constituted a final approach to that property.[25]

Here, as in *Combs*, Martin sustained his injuries in an area that exclusively serviced Six Flags and was used as a "receiving area" for its customers—a purpose

---

[23] *Id.* at 16 (4) (punctuation omitted).

[24] *See id.*

[25] *See id.*; *see also Chambers v. Peacock Const. Co.*, 115 Ga. App. 670, 676 (3) (155 SE2d 704) (1967) ("An invitation may arise from known customary use, and it may be inferred from conduct of from any state of facts upon which it naturally and necessarily arises. Such an invitation may cover the right of an invitee to be protected by ordinary care not only upon such portions of the premises as may be necessary for mere ingress and egress, but upon those parts which are necessary or incidental to the mutual business or purposes of the invitation. Mutuality means that each party is lawfully interested and that there is a common interest or mutual advantage involved in the visit." (citations omitted)).

other than servicing the public at large.[26] Furthermore, because Six Flags expressly *invited* its customers to use the CCT buses, it could "foresee a reasonable invitee would find it necessary or convenient to traverse [the bus stop] while entering or exiting in the course of the business for which the invitation was extended."[27]

---

[26] *Motel Props., Inc*, 263 Ga. at 486 (3) (distinguishing the "last few steps" taken by invitees, as opposed to "mere pedestrians" as they enter or exit the premises). *Cf. Harris v. Inn of Lake City*, 285 Ga. App. 521, 523 (647 SE2d 277) (2007) (holding that wooden steps leading to a beach, which were installed and maintained by the County and which the *general public* had to use to access the beach, did not constitute an approach to a beach resort); *Food Lion, Inc. v. Isaac,* 261 Ga. App. 311, 312-13 (582 SE2d 476) (2003) (holding that the parking lot of a grocery store was not an "approach" to the store when it was "a *common area* of the shopping center where the store was located and was owned and maintained by [the store's] landlord" (emphasis supplied)).

[27] *Motel Props., Inc*, 263 Ga. at 486 (2). Six Flags argues that Martin cannot succeed under a "control theory" because he has not shown that Six Flags exercised dominion or a continuing *exclusive* right to control the CCT bus stop area. But as explained *supra*, Georgia law does not require that a landowner exercise complete and exclusive control or dominion in order to extend the approaches to its premises. Indeed, in *Motel Properties*, our Supreme Court noted that, under certain circumstances, non-contiguous property can be deemed an approach merely by "some positive action on his part, such as constructing a sidewalk, ramp, or other direct approach." *Id.* at 486 (3); *accord Elmore of Embry Hills, Inc*., 124 Ga. App. at 420. In support of its "control theory" argument, Six Flags refers us to *Hous. Auth. of Atlanta v. Famble*, 170 Ga. App. 509 (317 SE2d 853) (1984), but its reliance on *Famble* is misplaced. Unlike this case, *Famble* did not involve the exception to the general definition of an "approach," whereby a landowner *extends* the approach to his property through some positive action or by appropriating it for his own benefit. *See generally id.* Instead, it addressed whether a landowner could be liable for injuries sustained on the primary premises (not an approach) when the property was in

17

In reaching a contrary conclusion, the dissent relies solely upon the Supreme Court of Georgia's decisions in *Motel Properties, Inc. v. Miller*[28] and *Todd v. F.W. Woolworth Company.*[29] But these cases are readily distinguishable. In *Motel Properties*, our Supreme Court held that "rip-rap,"[30] which was government property installed along the beach approximately 196 feet away from the motel's premises and 27 feet past the end of a sidewalk leading to the hotel, was not an approach to the motel when it was undisputed that the motel exercised no positive control over it.[31] In fact, unlike this case, there was no evidence that the motel took *any* positive actions to exert control over the rip-rap or that the area was used exclusively by its patrons solely for its benefit. And in *Todd*, our Supreme Court did not even reach the question of what constitutes an approach because the plaintiff was injured in an area

---

possession and control of another. *See id.* at 521 2 (a) ("The liability of an owner of property, if any, is dependent on whether said owner had any duty which might arise from control of the property or title thereto or a superior right to possession of property which is in possession or control of another." (punctuation omitted)).

[28] *See supra* footnote 4.

[29] *See supra* footnote 4.

[30] Rip-rap is a border of rock and concrete boulders placed along the shoreline to slow down the natural displacement of beach sand. *See Motel Props., Inc*, 263 Ga. at 485.

[31] *See Motel Props., Inc*, 263 Ga. at 485-87 (3) & (4).

18

that was "admittedly" an approach to the premises.[32] Thus, in *Todd*, the Court merely held that whether the property owner's negligence caused the plaintiff's injuries was a question for the jury.[33]

That said, it is perfectly understandable that neither the dissent nor Six Flags analogize this case to any *similar* Georgia premises-liability cases to support the conclusion that the CCT bus stop was not an approach as a matter of law. Because, unlike cases involving a single grocery store, restaurant, or motel, Six Flags is a 290-acre theme park with a high volume of patrons entering and exiting its premises (10,000 on a slow day), many of whom gain access to the park by using mass transit stations that service *only* Six Flags. And while this type of premises-liability case is

_____

[32] *See Todd*, 258 Ga. at 196-97 (1).

[33] *See id.* at 197 (1). The dissent also concludes that, in deciding this case, we must overrule our decision in *Wilks v. Piggly Wiggly*, 207 Ga. App. 842 (429 SE2d 322) (1993), a case in which we held that a premises-liability claim under OCGA § 51-3-1 survived summary judgment even though the property owner "presented unrebutted evidence establishing that it was not the owner or in control of the area in which the appellant was attacked nor was it responsible for maintaining the lighting in the area." Regardless of the facts, circumstances, and holding in *Piggly Wiggly*, it is not relevant to this case because, as explained herein, the jury was authorized by the evidence to find that the CCT bus stop where Martin was attacked was an approach to Six Flags's premises. As a result, we need not reconsider our ruling in *Piggly Wiggly* at this time.

unique in Georgia, it is worth noting that other jurisdictions have determined that certain areas that are not adjacent to the property owner's premises can nevertheless constitute an approach to the premises when the owner has reason to know that its customers routinely use those areas to access the premises.[34]

In sum, under the unique facts of this case (and viewing the evidence in the light most favorable to the jury's verdict), a reasonable jury could have found that the CCT bus stop was an approach to Six Flags's premises within the meaning of OCGA § 51-3-1 because Six Flags took positive steps to exert control over that area, invited its customers to use the bus stop, and appropriated the bus stop solely for its benefit.[35]

---

[34] *See, e.g., Ember v. B.F.D., Inc.*, 490 NE2d 764, 772 (1) (Ind. Ct. App. 1986) *opinion modified on denial of reh'g*, 521 NE2d 981 (Ind. Ct. App. 1988) (holding that a pub extended its duty of care beyond its premises to a parking lot *across a public street* when the record supported a reasonable inference that the pub knew its parking lot was insufficient for its patrons' use and was aware its patrons customarily used the parking lot across the street while patronizing it); *Warrington v. Bird*, 204 N.J. Super. 611, 617 (499 A2d 1026) (App. Div. 1985) ("Commercial entrepreneurs know in providing the parking facility that their customers will travel a definite route to reach their premises. The benefitting proprietor should not be permitted to cause or ignore an unsafe condition in that route which it might reasonably remedy, whether the path leads along a sidewalk or across a roadway."); *see also Steinberg v. N. Ill. Tel. Co.*, 260 Ill. App. 538, 542 (Ill. App. Ct. 1931) (holding that when a landowner knows or has good reason to know that a particular means of ingress or egress from the premises is unsafe, the landowner should not *invite* his patrons to use it).

[35] *See Motel Props., Inc*, 263 Ga. at 486 (3) (noting that the exception to the general definition of approach is "based on the fact that the owner or occupier of land,

2. Next, Six Flags argues that the jury's verdict must be reversed because the evidence was insufficient to prove causation. Again, we disagree.

(a) Six Flags first argues that it cannot be liable for an "unexpected random criminal act," which was the proximate cause of Martin's injuries.

As this Court has previously explained, "[a]lthough a landowner has a duty to invitees to exercise ordinary care to keep its premises safe . . . , the landowner is not an insurer of an invitee's safety."[36] Generally, an intervening criminal act by a third party "insulates a landowner from liability unless such criminal act was *reasonably*

_____

for *his own particular benefit*, has affirmatively exerted control over a public way or another's property" (emphasis supplied)); *Combs*, 287 Ga. App. at 16 (noting that, in considering whether a public way constitutes an approach to a landowner's property, "we consider what kinds of rights the property owner has in the public way, including whether *he has appropriated it for his own benefit*, using it for some purpose other than a public way" (emphasis supplied)). We note that the dissent contends that Martin's premises-liability claim fails for the additional reason that, at the time of the attack, he had left Six Flags's premises to use the restroom at a nearby hotel and then returned to the park premises to wait on the bus "for his own convenience." For this reason, the dissent concludes that, at the time when he was attacked, Martin was no longer an invitee of Six Flags. But because Six Flags has never argued that Martin lost his status as an invitee before he was attacked, it has waived that argument and this Court should not raise it *sua sponte* on Six Flags's behalf. *See Ware v. Multibank 2009 1 RES ADC Venture, LLC*, 327 Ga. App. 245, 251 (3) (758 SE2d 145) (2014) (holding that an argument is waived on appeal if it is not supported by cogent argument and citation to authority).

[36] *Agnes Scott College v. Clark*, 273 Ga. App. 619, 621 (1) (616 SE2d 468) (2005); *accord Sipple v. Newman*, 313 Ga. App. 688, 690 (722 SE2d 348) (2012).

*foreseeable.*"[37] And in order for the crime at issue to be foreseeable, "it must be substantially similar to previous criminal activities occurring on or near the premises such that a reasonable person would take ordinary precautions to protect invitees from the risk posed by the criminal activity."[38] Furthermore, in determining whether prior criminal acts are substantially similar to the occurrence causing harm, thereby establishing the foreseeability of risk,

> the court must inquire into the location, nature and extent of the prior criminal activities and their likeness, proximity or other relationship to the crime in question. While the prior criminal activity must be substantially similar to the particular crime in question, *that does not mean identical*. What is required is that the prior incident be sufficient to attract the landowner's attention to the dangerous condition which resulted in the litigated incident.[39]

---

[37] *Agnes Scott College*, 273 Ga. App. at 621 (1) (emphasis supplied); *accord Walker v. Aderhold Props., Inc.*, 303 Ga. App. 710, 712 (1) (694 SE2d 119) (2010).

[38] *Agnes Scott College*, 273 Ga. App. at 621 (1); *accord Sturbridge Partners, Ltd. v. Walker*, 267 Ga. 785, 786 (482 SE2d 339) (1997).

[39] *Agnes Scott College*, 273 Ga. App. at 621-22 (1) (punctuation omitted) (emphasis supplied); *accord Sturbridge Partners, Ltd.,* 267 Ga. at 786.

Finally, it is important to keep in mind that "the question of 'reasonable foreseeability' of a criminal attack is generally for a jury's determination rather than summary adjudication by the courts."[40]

Here, there was overwhelming evidence that Six Flags was well aware of the dangerous conditions in and around its theme park that resulted in Martin's brutal attack. Specifically, in the years prior to the vicious attack on Martin, there had been other criminal attacks that began inside the park and "spilled over" to areas surrounding the park. For example, approximately one year before the incident in this case, a gang fight began inside the park and continued outside of the park's gates. This fight escalated to the point where shots were fired in Six Flags's parking lot, which resulted in several injuries. And following this incident, Six Flags asked police not to release any information that would undermine its efforts to promote the park as having a "safe, family atmosphere."

As detailed more fully *supra*, on the day of Martin's brutal attack, several of his assailants, including at least one Six Flags employee, accosted and threatened two families inside the park. Specifically, gang members threatened to "beat the shit out

---

[40] *Sturbridge Partners,* 267 Ga. at 786 (punctuation omitted); *accord Bethany Grp., LLC v. Grobman*, 315 Ga. App. 298, 301 (1) (b) (727 SE2d 147) (2012).

23

of [them]" and "get" them in the parking lot. The families reported the incident to Six Flags security and gave a physical description of the gang members, but Six Flags inexplicably allowed the gang members to remain in the park. Six Flags asserts that "a combination of verbal abuse, gang garb, and rowdy conduct" is not enough create a jury question as to foreseeability. But Six Flags—in addition to being on notice of the foregoing altercation on the day of Martin's attack—was also keenly aware of other criminal activity in and around the park, including gang activity. Indeed, there was evidence that Six Flags knew that (1) the park was located in a high-crime area, (2) the bus stops and parking lots were especially dangerous; (3) the risk of violence increased at closing time; (4) it employed gang members, (5) gangs can be violent, and (6) altercations inside the park had the potential to create "spillover violence" outside the park.[41] Additionally, there was testimony that the "majority of people that worked at Six Flags [were] in a gang."

---

[41] As previously noted, there was evidence that Cobb County police advised Six Flags to provide security near the CCT bus stop and MARTA station, but Six Flags declined to do so *on weekdays* due to budgetary restrictions. Such evidence supports a reasonable inference that Six Flags could afford to provide security on weekends. And we have previously held that "the voluntary undertaking to provide security on weekend nights could be construed by the jury to be evidence of foreseeability of criminal conduct." *Wade v. Findlay Mgmt., Inc.*, 253 Ga. App. 688, 690 (560 SE2d 283) (2002).

The dissent concludes that the vicious, unprovoked attack on Martin was not reasonably foreseeable because it "bore no likeness to any prior criminal activity in or near the park." But as noted *supra*, Georgia law does not require prior criminal acts to be *identical* to the one at issue for it to be reasonably foreseeable.[42] Indeed, such a rigid approach to determining foreseeability is "not in keeping with either common sense or existing law."[43] And for all of the foregoing reasons, the evidence supported the jury's finding that it was reasonably foreseeable that someone could be attacked by gang members at the CCT bus stop, which Six Flags *invited* its customers to use.[44]

---

[42] *See Sturbridge Partners, Ltd.,* 267 Ga. at 786; *Agnes Scott College*, 273 Ga. App. at 621-22 (1).

[43] *Walker*, 303 Ga. App. at 713 (1).

[44] *See Sturbridge Partners, Ltd.,* 267 Ga. at 787 (holding that, because a landlord was aware of prior burglaries of vacant apartments, it was reasonably foreseeable that an unauthorized entry could occur when an apartment was occupied that resulted in a "brutal rape"); *accord Bethany Grp.*, 315 Ga. App. at 301-02 (1) (b) (holding that a jury could find that the murder of a cab driver that had been called to an apartment complex was reasonably foreseeable when the apartment complex "had actual knowledge of the particular dangerous condition of serious crime in the area and on the premises and of the risks posed by dangerous characters involved in that type of activity"); *Walker*, 303 Ga. App. at 713 (holding that prior property crimes were sufficient to make a subsequent sexual assault reasonably foreseeable to landlord).

25

(b) Six Flags also argues that Martin's "theory of causation" is too speculative. Specifically, Six Flags contends that Martin's "laundry list" of the missed security measures resulting in his attack is too "speculative" to prove causation, as Martin presented no expert testimony on security-gang issues. But Six Flags provides no legal authority even remotely suggesting that a plaintiff cannot show causation in a premises-liability case without *expert* testimony. To the contrary, in Georgia, "[w]hat amounts to proximate cause is undeniably a jury question and is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent."[45]

Here, there was evidence that Six Flags ignored Officer Herman's advice to provide security near the CCT bus stop during all operating hours. In addition, the same gang members, including at least one Six Flags employee, threatened and terrorized two families earlier on *the same day* when they violently attacked Martin, and although Six Flags was aware of the incident, it refused to eject them from the park. And as discussed *supra*, Six Flags was keenly aware of the serious gang problem and criminal activity that occurred in and around its premises. Further, there

---

[45] *Reed v. Carolina Cas. Ins. Co.*, 327 Ga. App. 130, 132 (2) (762 SE2d 90) (2014) (punctuation omitted); *see Zeagler v. Norfolk S. Ry. Co.*, 317 Ga. App. 302, 308 (2) (730 SE2d 657) (2012) ("Causation is traditionally a decision for the jury.").

appears to be no evidence of any efforts that Six Flags made to address these pressing issues. The foregoing evidence of causation, then, is specific and does not require speculation. Moreover, in numerous cases, we have "reiterated the principle that questions of negligence and causation, except in *plain*, *palpable*, and *indisputable cases*, are solely for jury determination."[46] And the foregoing evidence simply renders this case not within the "indisputable" category.

3. Finally, Six Flags argues that the trial court erred in denying its request to include some of Martin's assailants on the verdict form for apportionment of fault. We agree.

As a preliminary matter, Martin argues that Six Flags failed to adequately preserve its apportionment argument or has waived it on appeal. Under OCGA § 51-12-33 (d) (1), a defendant seeking to submit an apportionment issue to the jury must give notice no later than 120 days prior to the date of trial that a nonparty was either wholly or partially at fault.[47] And here, it is undisputed that Six Flags complied with the notice requirement. In its notice and supporting brief, Six Flags contended that

---

[46] *Zeagler*, 317 Ga. App. at 308 (2) (punctuation omitted) (emphasis supplied).

[47] *Double View Ventures, LLC v. Polite*, 326 Ga. App. 555, 561-62 (1) (b) (757 SE2d 172) (2014); *accord Monitronics Int'l, Inc. v. Veasley*, 323 Ga. App. 126, 136 (3) (746 SE2d 793) (2013).

27

numerous individuals involved in the attack on Martin should be included on the verdict form, including several unknown "John Does," Brandon Forbes, Ander Cowert, Jonathan McCoy, Brian Gay, Nicholas Gay, David Miller, Kentavious Stevens, and Mark Davis. Moreover, during trial, there was some evidence that Cowart, Forbes, and a John Doe by the name of "Mr. Black" (all nonparties in the case) had some involvement in the vicious attack of Martin, and at the conclusion of trial, Six Flags requested that these individuals be included on the verdict form for apportionment of fault. Ultimately, the trial court denied Six Flags's request, including only Six Flags and the four individuals with certified criminal convictions related to Martin's attack on the verdict form.

As noted *supra*, Six Flags referenced McCoy and several "John Does" in its pretrial apportionment notice, but it did not reference McCoy or any John Does other than "Mr. Black" when the trial court expressly asked Six Flags at the conclusion of trial who it wanted to include on the verdict form. Thus, Six Flags failed to preserve any argument that those parties should have been listed on the verdict form.[48]

---

[48] *See Dempsey v. Gwinnett Hosp. Sys., Inc*., 330 Ga. App. 469, 475 (765 SE2d 525) (2014) ("Inasmuch as we are a court for the correction of errors, we do not consider issues which were not raised below and ruled on by the trial court." (punctuation omitted)).

Nevertheless, Six Flags did seek to have Cowart, Forbes, and a "Mr. Black," included on the verdict form and there is evidence in the record that these individuals were present and may have been involved in the attack.

Martin argues that, although Six Flags requested that these parties be added to the verdict form before the trial court, it has waived any challenge to the court's apportionment ruling by failing to adequately brief the issue on appeal. But in its initial brief, Six Flags argued that the trial court erred in failing to include certain nonparties on the verdict form, "*such as*, McCoy and the John Doe defendants." And Mr. Black was among those John Doe defendants. Moreover, in its reply brief, Six Flags expanded its argument in response to Martin's claim that the apportionment issue had not been preserved. Specifically, Six Flags argued that the trial court erred in failing to include Cowart on the verdict form and cited to evidence of Cowart's involvement in the attack. As a result, Six Flags has not waived its apportionment argument, at least as to Cowert and "a John Doe by the name of Mr. Black," and thus, this Court may review its apportionment argument at least as to these two individuals.

Under OCGA § 51-12-33 (c), "[i]n assessing percentages of fault, the trier of fact *shall consider* the fault of *all* persons or entities who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been,

29

named as a party to the suit."[49] This statutory scheme is designed to "apportion damages among all persons or entities who contributed to the alleged injury or damages—even persons who are not and could not be made parties to the lawsuit—a scheme that makes no sense if persons whose intentional acts that contributed to the damages are excluded."[50] And, of course, it is a defendant's burden to establish a rational basis for apportioning fault to a nonparty; but whether the defendant meets that burden given the evidence at trial is an issue that should be left to the jury.[51]

Turning to the case at hand, at the close of trial, when Six Flags attempted to direct the trial court to evidence in support of its request to include Cowart, Forbes, and "Mr. Black," on the verdict form, the court repeatedly interrupted Six Flags's attorney by saying "no," which essentially prevented it from arguing what evidence showed the involvement of these individuals in Martin's attack. Furthermore, in

---

[49] Emphasis supplied.

[50] *Couch v. Red Roof Inns, Inc.*, 291 Ga. 359, 362 (1) (729 SE2d 378) (2012) (punctuation omitted); *see Zaldivar v. Prickett*, 297 Ga. 589, 593 (774 SE2d 688) (2015); *see also Walker v. Tensor Mach. Ltd.*, No. S15Q1222, 2015 WL 7135149, at *6 (Ga. 2015) (holding that a trier of fact may consider assigning fault to a *nonparty* employer that has immunity under the provisions of the Worker's Compensation Act).

[51] *Couch*, 291 Ga. at 366 (1); *Double View Ventures, LLC*, 326 Ga. App. at 562 (1) (b).

denying Six Flags's apportionment request, the court indicated that it would only consider including individuals who had a criminal conviction related to the attack or who personally testified to their involvement. The court even expressed reluctance to include one of the individuals who had a *criminal conviction* in connection with the attack on Martin because there was no evidence that the person physically touched Martin.

It is clear from the trial court's statements in addressing the issue of apportionment that it misapplied well-established Georgia law, setting the bar far too high for determining who could be considered to have contributed to Martin's injuries. Indeed, the Supreme Court of Georgia has held, in a premises-liability case, that a jury is even authorized to apportion fault between an *unknown* criminal actor and the property owner.[52] Furthermore, and contrary to the trial court's suggestion, we have allowed juries to apportion fault to individuals who were present during a victim's injury, but who did not physically touch or harm the victim.[53] In sum,

---

[52] *See GFI Mgmt. Servs., Inc. v. Medina*, 291 Ga. 741, 741-43 (733 SE2d 329) (2012); *see also Double View Ventures, LLC*, 326 Ga. App. at 562 (1) (b) (noting that the apportionment statute does not require precise party identification).

[53] *See Accor N. Am., Inc. v. Todd*, 318 Ga. App. 317, 318-19 (733 SE2d 846) (2012) (reversing the trial court's finding that the jury could not considering apportioning fault related to a shooting to three criminal assailants, when only one of

because there was some evidence that Cowart and Mr. Black may have contributed to Martin's injuries, the trial court erred by removing from the jury's consideration the issue of whether those individuals should be apportioned fault.[54] As a result, the jury's verdict must be reversed and remanded for a new trial.

In her thoughtful concurrence, Judge Miller agrees that the trial court erred in denying Six Flags's apportionment request, but she would remand the case for a trial solely on damages. But this Court has already held that an apportionment error entitles a defendant to a new trial. In *Double View Ventures, LLC v. Polite*,[55] this Court held that the trial court erred by refusing to allow the jury to consider whether a certain nonparty was partially at fault for injuries sustained by the victim during a shooting.[56] Specifically, this Court held that "[s]ince there is some evidence showing that the [nonparty] may have contributed to [the victim's] injuries, we [were]

---

the assailants shot the victim).

[54] *See Couch*, 291 Ga. at 366 (1) (noting that whether the property owner can establish evidence to support any rational basis for apportionment is a question of fact for the jury); *Double View Ventures, LLC*, 326 Ga. App. at 562 (1) (b) (explaining that whether the defendants had met their burden of establishing a rational basis for apportioning fault to a non-party should be left for the jury to determine).

[55] 326 Ga. App. 555.

[56] *See id.* at 556, 560 (1) (a).

constrained to *reverse the jury's verdict* because the jury did not have the opportunity to consider whether the [nonparty] should be apportioned fault."[57] In doing so, we expressed our desire to honor the jury's "substantial" verdict, but explained that it must be reversed due to the apportionment error.[58] Finally, in Division 3 of that opinion, we declined to address any challenges to the trial court's evidentiary rulings that were "not likely to recur during *retrial of the case* . . . ."[59]

While we understand and appreciate the concerns expressed by Judge Miller in her special concurrence, we are unable to agree with her conclusion that Six Flags is only entitled to relitigate damages, when the defendant in *Double View* was entitled to a new trial. And while Judge Miller is correct that nothing in the text of OCGA § 51-12-33 mandates a new trial, it is likewise true that the statute does not authorize a different jury from the one who found liability to determine the respective fault of those involved. To the contrary, OCGA § 51-12-33 provides that "[w]here an action is brought against more than one person for injury to person or property, the trier of fact, *in its determination of the total amount of damages to be awarded, if any*, shall

---

[57] *Id.* at 561 (1) (a) (emphasis supplied).

[58] *See id.*

[59] *Id.* at 564 (3) (emphasis supplied).

33

. . . apportion its award of damages among the persons who are liable according to the percentage of fault of each person."[60] Thus, under the plain language of the statute, a jury may apportion fault only *after* hearing the evidence and determining whether any damages should be awarded at all.

In concluding that Six Flags is entitled to a new trial, we fully recognize and "deplore the significant burden that a retrial will impose, not only on the parties, but on the community as well,"[61] and we are concerned by the trial court's error given the well-established precedent that Six Flags was entitled to have the requested individuals placed on the verdict form. Nevertheless, this Court must remain "steadfast in its commitment . . . to safeguarding the sacrosanct and cherished right

---

[60] OCGA § 51-12-33 (b).

[61] *Guoth v. Hamilton*, 273 Ga. App. 435, 440-41 (1) (615 SE2d 239) (2005).

34

to a fair and impartial jury trial,"[62] and that cannot happen unless trial courts abide by this Court and our Supreme Court's clear guidelines on apportionment of fault.

In sum, although a reasonable jury could have found Six Flags to be liable under a premises-liability theory for Martin's injuries, we are constrained to reverse the jury's verdict and remand the case for a new trial as a result of the trial court's error in failing to include the aforementioned individuals on the verdict form.[63]

---

[62] *Harper v. Barge Air Conditioning, Inc.*, 313 Ga. App. 474, 479 (722 SE2d 84) (2011); *see also* Ga. Const. Art. I, Sec. I, Para. XI(a) (providing that the right to a jury trial "shall remain inviolate"); *Jones v. Cloud,* 119 Ga. App. 697, 706 (5), 168 S.E.2d 598 (1969) (holding that "an impartial jury is the corner-stone of the fairness of trial by jury"); *Melson v. Dickson,* 63 Ga. 682, 1879 WL 2629 (1879) (same); Morris S. Arnold, *A Historical Inquiry into the Right to Trial by Jury in Complex Civil Litigation, in* The Bill of Rights: Original Meaning and Current Understanding 399, 400 (Eugene W. Hickok, Jr. ed., 1993) ("That special affection for the jury ought to be viewed as relevant not just to the fact that jury trial was 'preserved' in the Constitution; it is relevant as well to interpreting the scope of the actual provision, for it gives the right granted an aura and the Constitution a meaning they would not otherwise have if the institution of jury trial had been regarded more or less indifferently.").

[63] In cross appeal No. A15A0829, Martin argues that the trial court erred by denying one of his requested jury instructions and by denying his request to enter judgment against Six Flags as of the verdict date, which deprived him of post-judgment interest. Because this case should be remanded for a new trial, Martin's arguments in his cross appeal are moot.

For all of the foregoing reasons, in Case No. A15A0828, we reverse the jury's verdict and remand the case for a new trial, and we dismiss Case No. A15A0829 as moot.

*Judgment reversed and case remanded for a new trial in Case No. A15A0828. Barnes, P. J., Boggs, Ray and Branch, JJ., concur. Miller, McFadden and McMillian, JJ., concur specially. Ellington, P. J. and Phipps, P. J., concur in judgment only. Doyle, C. J. and Andrews, P. J., dissent. Case No. A15A0829 dismissed as moot. Barnes, P. J., Ellington, P. J., Phipps, P. J., Miller, McFadden, Boggs, Ray, Branch, and McMillian, JJ., concur. Doyle, C. J. and Andrews, P. J., dissent.*

A15A0828, A15A0829.  SIX FLAGS OVER GEORGIA II, L.P. et

 al.  v. MARTIN; and vice versa.

MILLER, Judge, specially concurring.

I agree with the majority's well-reasoned conclusion that the jury was authorized to find Six Flags liable for Martin's injuries, and that the jury's verdict must be reversed because the trial court erred in denying Six Flags's request to allow the jury to consider whether certain nonparties should be apportioned fault.  I write separately, however, because it is not clear that the named defendants, including Six Flags, should get a second opportunity to dispute their liability when the overwhelming evidence in the case establishes their liability for Martin's injuries and when the error in the case related solely to a determination of damages.

Prior to the 2005 amendments to OCGA § 51-12-33, liability could be apportioned among defendants only in those situations where the plaintiff was to some degree at fault and no statutory provision allowed the jury to consider the possible fault of non-parties to the litigation. See former OCGA § 51-12-33.[1] Thus, prior to the 2005 amendments, the liability of the defendant(s) and the recovery of damages were issues that were inextricably joined. See *Head v. CSX Tranportation, Inc.*, 271 Ga. 670, 673 (4) (524 SE2d 215) (1999).

With the 2005 amendments to OCGA § 51-12-33, the Legislature provided a procedure whereby defendants could seek to reduce their damages based on the fault

---

[1] Former O.C.G.A. § 51-12-33 read as follows:

(a) Where an action is brought against more than one person for injury to person or property and the plaintiff is himself to some degree responsible for the injury or damages claimed, the trier of fact, in its determination of the total amount of damages to be awarded, if any, may apportion its award of damages among the persons who are liable and whose degree of fault is greater than that of the injured party according to the degree of fault of each person. Damages, if apportioned by the trier of fact as provided in this Code section, shall be the liability of each person against whom they are awarded, shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution.

(b) Subsection (a) of this Code section shall not affect venue provisions regarding joint actions.

(c) This Code section shall apply only to causes of action arising on or after July 1, 1987.

2

of nonparties. See OCGA § 51-12-33 (b) - (d). The statute, while speaking generally of a determination of fault based on a party's liability, also provides that the determination of the nonparties' percentages of fault, if any, bears *only* on the percentages of fault of the named parties. See OCGA § 51-12-33 (f) (1). The fault of the nonparties, however, does *nothing* to alter the named defendants' liability. Therefore, the statute does not *require* a retrial on liability when the error relates only to the apportionment of fault of the nonparties, who cannot be held liable. See OCGA § 51-12-33 (f) (2) (findings of fault as to a nonparty shall not subject the nonparty to liability in any action).

Moreover, the majority's reliance on *Double View Ventures, LLC v. Polite*, 326 Ga. App. 555, 561-562 (1) (b) (757 SE2d 172) (2014), does not assist in directing us toward the proper procedure on retrial. It does not appear that the parties raised the issue of whether a retrial on all issues or just damages was appropriate, nor did the Court squarely address the issue. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (Citation and punctuation omitted.) *Johnson v. Bank of America, N. A.*, 333 Ga. App. 539, 542 (2) (773 SE2d 810) (2015). While I recognize that much of the evidence establishing Six Flags's and

3

the other defendants' liability is the same evidence that would establish their respective faults for Martin's injuries, nothing in the OCGA § 51-12-33 requires a redetermination of their liability.

Furthermore, while the majority would have the issue of liability reheard at a new trial, Six Flags would nevertheless be precluded from relitigating that issue under the law of the case, barring some improbable circumstance. See OCGA § 9-11-60 (h) (providing that "any ruling by the Supreme Court or the Court of Appeals in a case *shall* be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be."); *Grindle v. Chastain*, 229 Ga. App. 386, 389 (2) (493 SE2d 714) (1997) (jury's rejection of defendant's arguments in the first trial settled the disputed issue where the evidence at the second trial was substantially the same).[2]

---

[2] The law of the case does not apply when the evidentiary posture of the case changes either because a new issue not previously addressed is raised by the parties or when the original evidence submitted is found to be insufficient. *Davis v. Silvers*, 295 Ga. App. 103, 106 (670 SE2d 805) (2008). As to the first situation, unless the pleadings are amended, there are no new issues to be raised regarding liability that have not been addressed by this Court since this Court has already rejected Six Flags's argument that it was not liable because it had no duty to protect Martin from an unforeseeable criminal attack and because his injuries did not occur on its premises or approaches. As to the second situation, it clearly would not apply because we have determined that the evidence of Six Flags's liability was sufficient.

4

That this case must be retried at all is particularly unfortunate because it was clear that the trial court was required to place the nonparties on the verdict form. I agree with the majority that retrial on all issues imposes a significant burden on all parties, the judicial system, and the citizens of Cobb County, where this brutal attack occurred and where the case was tried. In the absence of the Legislature's express requirement, I do not believe it is prudent to increase these burdens by requiring a full retrial on all issues when the apportionment of damages error concerns only nonparties.

I am authorized to state that Judge McFadden and Judge McMillian join this opinion.

A15A0828; A15A0829.  SIX FLAGS OVER GEORGIA II, L.P. et

 al. v. MARTIN; and vice versa.

 ANDREWS, Presiding Judge, dissenting.

 Six Flags was entitled to judgment as a matter of law on Joshua Martin's premises liability claim under OCGA § 51-3-1 seeking to hold Six Flags liable for injuries Martin suffered in a third party criminal attack on public property which was not part of the Six Flags premises or approaches.  Because Martin failed to produce evidence at trial sufficient to sustain his claim under OCGA § 51-3-1, the trial court erred by denying Six Flags' motions for a directed verdict and judgment notwithstanding the verdict.  It follows that the judgment entered on the jury verdict in favor of Martin should be reversed and the case remanded in Case No. A15A0828 with direction that judgment be entered in favor of Six Flags.  In the cross-appeal in Case No. A15A0829, Martin's claim that he was entitled to additional jury

instructions is without merit, and his claim related to post-judgment interest on the judgment is moot. There is no basis for a re-trial on any issue raised in the appeal or cross-appeal. I respectfully dissent.

After leaving the Six Flags Over Georgia amusement park, Joshua Martin suffered a serious brain injury caused by an unprovoked criminal attack by a group of people who left the park shortly after Martin. The attack occurred at the Cobb County Transit bus stop on public property owned by Cobb County located about 200 feet from the park premises. Martin filed a premises liability suit pursuant to OCGA § 51-3-1 against Six Flags Over Georgia, LLC, which owns the park, and Six Flags Over Georgia II, L.P., which leases and operates the park (jointly referred to as Six Flags).[1] Martin alleged under OCGA § 51-3-1 that the proximate cause of the criminal attack and his injury was the failure of Six Flags to exercise ordinary care to keep the park premises and approaches safe for him as an invitee at the park. The suit was tried before a jury which rendered a verdict in favor of Martin for damages in the amount of $35,000,000.00. Based on the jury's verdict assessing 92 percent of

---

[1] In the same suit, Martin also brought assault and battery claims against named and John Doe individual attackers, and Six Flags asserted that additional known and unknown non-party attackers should be apportioned fault for Martin's injury pursuant to OCGA § 51-12-33.

2

the fault to Six Flags, the trial court entered judgment against Six Flags in the amount of $32,200,000.00, plus $541,093.12 for prejudgment interest, plus court costs and post-judgment interest.

On appeal, Six Flags contends that the trial court erred by refusing to grant it judgment as a matter of law on Martin's premises liability claim on grounds asserted at trial in support of its unsuccessful motions for a directed verdict and for judgment notwithstanding the verdict. Six Flags contends that it was entitled to judgment as a matter of law on the claim under OCGA § 51-3-1 because the evidence at trial showed: (1) that the criminal attack on Martin occurred after he had left the park; (2) that the attack occurred at a location that was not on the park premises or approaches; (3) that the attack occurred on Cobb County public property in which Six Flags had no rights of ownership or control sufficient to give it the ability to prevent the attack; (4) and that for these reasons Six Flags had no duty or liability under OCGA § 51-3-1. For the reasons which follow, I agree with Six Flags that the trial court erred in denying the motions, and find that Six Flags was entitled to judgment as a matter of law on Martin's premises liability claim under OCGA § 51-3-1.

Martin's cause of action to recover damages for the injuries he suffered in the criminal attack set forth a premises liability claim against Six Flags based on OCGA § 51-3-1, which provides that:

> Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.

The duty under OCGA § 51-3-1 to exercise ordinary care to keep the premises and approaches safe for invitees does not require the premises owner[2] to insure the safety of invitees from criminal attack by third persons . *Days Inns of America, Inc. v. Matt*, 265 Ga. 235, 236 (454 SE2d 507) (1995). Under OCGA § 51-3-1, the premises owner has a duty to exercise ordinary care to protect an invitee from a criminal attack only where the criminal act was foreseeable. *Sturbridge Partners, Ltd. v. Walker*, 267 Ga. 785, 785-786 (482 SE2d 339) (1997). A criminal act against an invitee is foreseeable if it is substantially similar in type to previous criminal activities occurring on or near the premises. Id. at 786. Moreover, as OCGA § 51-3-1 plainly states, the duty "to exercise ordinary care in keeping the premises and approaches safe" requires the

---

[2] References in this opinion to the premises "owner" includes "owner or occupier" of the premises under OCGA § 51-3-1.

premises owner to protect invitees from unsafe conditions, including foreseeable criminal acts, which occur on "the premises and approaches" controlled by the premises owner. See *Todd v. F. W. Woolworth Co.*, 258 Ga. 194, 196 (366 SE2d 674) (1988); *Motel Properties, Inc. v. Miller*, 263 Ga. 484, 486 (436 SE2d 196) (1993).

The evidence at trial showed the following regarding the attack and where it occurred: On the day of the attack, Martin had been an invitee at the Six Flags amusement park. Shortly before the 9:00 p.m. closing time at the park, Martin (accompanied by two friends) left the park, walked about 200 feet down Six Flags Parkway (a public street), away from the park to the intersection of the Parkway with South Service Road (another public street), then walked down South Service Road to a nearby hotel where they used the restroom. After using the restroom, Martin and his friends walked back to the intersection of Six Flags Parkway and South Service Road, where the Cobb County Transit (CCT) bus stop was located on public land adjacent to the public streets. When they arrived at the bus stop, they had missed the 9:00 p.m. bus. So they walked the 200 feet back down Six Flags Parkway toward the park and sat on a rail near the park entrance to wait on the next bus. Although not inside the park, which had already closed, the rail was on property owned by Six Flags in front of the park. The area in front of the park was crowded at the time with

5

numerous Six Flags customers still leaving the area. From that location, Martin and his friends saw group of people in the area wearing similar clothing (matching t-shirts), and left the rail area, and walked 200 feet away from the park down Six Flags Parkway to the CCT bus stop where they waited for the bus. At the bus stop, Martin and his friends heard somebody yell something, at which point the group they had just seen in front of the park attacked them without provocation. One of the group members hit Martin with brass knuckles, knocking him to the ground, and numerous other members of the group continued the attack by stomping on Martin. One member of the group that attacked Martin at the bus stop said he saw Martin and his friends at the rail in front of the park, and saw them walk toward the CCT bus stop down the side of Six Flags Parkway. According to this group member, the group then walked to the bus stop in the median of the Parkway and "wasn't really following them to the bus stop, we was going to the bus stop." At the bus stop, one of the group said, "Let's go fight these dudes over here." At that point, a member of the group initiated the unprovoked attack by walking over to Martin at the bus stop and punching him. The evidence shows that the attack occurred about 200 feet from the Six Flags park premises at the CCT bus stop, which was located on public property owned by Cobb

County adjacent to the intersection of two public streets (Six Flags Parkway and South Service Road) also owned by Cobb County.

At trial, Martin contended that the criminal attack against him at the CCT bus stop was foreseeable, and that Six Flags breached a duty under OCGA § 51-3-1 to exercise ordinary care to prevent the foreseeable attack. As to foreseeability of the attack, the evidence showed: About a year prior to the attack on Martin, a shooting occurred at the MARTA bus stop located at the time on the Six Flags park premises near the West parking lot adjacent to the park entrance. Three people at the bus stop, none of whom were the intended victims, were wounded by gunshots fired at the intended victim by a gunman in a passing car. There was evidence that the shooting occurred after a gang-related fight in the park caused one gang member to shoot at another gang member after they left the park. Six Flags was aware that the park was located in a high crime area of Cobb County. Six Flags was aware that groups of people in the park wearing clothes with matching colors were associated with being gang members. Six Flags was aware of gang-related graffiti in the park, and also knew of gang-related graffiti in the locker room that Six Flags provided for its male employees at the park. Six Flags knew that some of its employees were gang members, and knew that gangs could be violent. In a five-year period prior to the

7

attack on Martin, the record showed over 50 reports inside the park (documented by Six Flags security and Cobb County police) which showed incidents with some degree of violent behavior involving Six Flags employees and customers, including disorderly and unruly conduct, fighting, pushing and shoving, verbal cursing and threats, and criminal trespass. A Cobb County police officer who worked off-duty for Six Flags providing security at the park said he was aware of gang-related graffiti at the park, and sometimes saw groups dressed alike "causing problems" at the park, but that there was no gang violence at the park. As to the attack on Martin at the CCT bus stop, the same Cobb County officer said that Cobb County police had made prior disorderly conduct arrests in the bus stop area, but there had been no fighting incident in any area around the CCT bus stop prior to the attack on Martin. He also said that he was aware of no prior attack like the attack on Martin occurring in or around the park. Six Flags knew from experience that disputes that started inside the park had the potential to create "spillover violence" that continued outside the park.

Additional evidence at trial showed: The group that attacked Martin at the CCT bus stop shortly after the park closed at 9:00 p.m. included off-duty Six Flags employees who were wearing clothing (t-shirts) with similar colors. Just prior to the park closing on the day of the attack, Six Flags security responded to complaints

inside the park that the same group that later attacked Martin was verbally threatening park customers. Six Flags security observed the same group in front of the park at closing time moving toward the Six Flag West parking lot, but saw no threatening behavior at that time. In the crowded West parking lot, the group followed the customers they had threatened inside the park and made more threats before the customers left in their vehicle. There is no evidence that Six Flags security responded to or was aware of the threats made by the group in the West parking lot. Six Flags security stationed in front of the park shortly after closing saw the same group walking away from the park toward the CCT bus stop, and then, well after closing, saw blue lights from Cobb County police cars responding at the CCT bus stop where the group attacked Martin.

1. On the above evidence, Martin contended at trial that the criminal attack on him at the CCT bus stop was foreseeable to Six Flags; that the attack occurred on an approach to the park; and that Six Flags was liable under OCGA § 51-3-1 for failing to provide adequate security to prevent the attack. I find that, because there was no evidence establishing that Martin was attacked on the Six Flags park premises or

9

approaches, even assuming the attack at the bus stop was foreseeable, Six Flags had

no duty to prevent it and was entitled to judgment as a matter of law.[3]

Although the criminal attack occurred about 200 feet outside the park premises,

Martin contends that the jury verdict and judgment imposing liability on Six Flags

under OCGA § 51-3-1 should be affirmed because evidence showed that the attack

occurred on an approach to the park within the meaning of the statute, and that Six

Flags failed to exercise ordinary care to keep the approach safe from a foreseeable

attack while he was an invitee.

---

[3] Although it is not necessary to determine whether the criminal attack on Martin was foreseeable, there was a lack of evidence showing a prior attack on or near the park remotely similar to the random and brutal physical attack on Martin by multiple gang members. Six Flags was aware of numerous prior instances of minor gang-related violence and threats of violence at the park. But the only prior gang-related incident even approaching the nature and extent of the violent nature of the Martin attack was the shooting at the MARTA bus stop between gang members, which was provoked by a fight between the rival gang members. "In determining whether previous criminal acts are substantially similar to the occurrence causing harm, thereby establishing the foreseeability of risk, the court must inquire into the location, nature and extent of the prior criminal activities and their likeness, proximity or other relationship to the crime in question." *Sturbridge*, 267 Ga. at 786. The Martin attack was not foreseeable to Six Flags because it was an unprovoked, random, physical assault by a rampaging gang, which bore no likeness to any prior criminal activity in or near the park.

Premises and approaches are not the same under OCGA § 51-3-1; rather, "[p]remises and the approaches to those premises are the two areas the owner must use due care to keep safe." *Todd*, 258 Ga. at 196. In *Motel Properties,* 263 Ga. at 486, the Supreme Court construed "approaches" to mean

> that property directly contiguous, adjacent to, and touching those entryways to premises under the control of an owner or occupier of land, through which the owner or occupier, by express or implied invitation, has induced or led others to come upon his premises for any lawful purpose, and through which such owner or occupier could foresee a reasonable invitee would find it necessary or convenient to traverse while entering or exiting in the course of the business for which the invitation was extended. By "contiguous, adjacent to, and touching," we mean that property within the last few steps taken by invitees . . . as they enter or exit the premises. It is only within the confines of this limited approach that *Todd* [,supra,] imposes a duty on a landowner to exercise ordinary care over property not within the landowner's control.

Id. at 486. Thus, *Motel Properties* defined "approaches" to be property "directly contiguous, adjacent to, and touching" the entryways to the "premises under the control" of the owner, but limited that definition by concluding it applied only to "property within the last few steps taken by invitees . . . as they enter or exit the premises." Id. at 486. The location of the attack on Martin, about 200 feet from the park premises, was clearly not within the last few steps taken by Martin as an invitee as he exited the park premises on foot, so there was no evidence that the attack was

11

located on a contiguous approach to the premises. But *Motel Properties* also noted exceptions to the above-stated definition of contiguous approaches, and held that "under certain circumstances non-contiguous property can be deemed an approach because the landowner extended the approach to his premises by some *positive action* on his part, such as constructing a sidewalk, ramp, or other *direct* approach." Id. at 486 (citations and punctuation omitted). For this kind of exception to apply, the owner must take positive action to exercise dominion or control over a public way or another's property for the owner's benefit. Id. at 486. Before finding that an owner has extended an approach to his premises over a non-contiguous public way or property,

> [t]he requirement of an act reflecting a landowner's positive exercise of dominion over a public way or another's property is necessary in order to avoid imposing upon invitors an unknowable and impossible burden for maintaining an undefined circumference of properties.

Id. at 486 (citation and punctuation omitted). Without a positive act demonstrating the owner's control over a public way or another's property, there is no basis for concluding that the owner has extended the approach to his premises over that non-contiguous area, and the owner has no duty under OCGA § 51-3-1 to exercise ordinary care to keep that extended area safe for invitees. Id. at 486, n.6. Moreover,

the duty imposed under OCGA § 51-3-1 on a premises owner to keep an approach to the premises safe for invitees is "circumscribed by his right in the approach." *Todd*, 258 Ga. at 196.

> If his right in the approach is the fee then the duty under OCGA § 51-3-1 is the exercise of due care by one who has the rights of an owner of a fee. He has the widest latitude in the use of the approach and must exercise due care within that framework to keep the approach safe. If his right in the approach is an easement his duty is to use due care toward his invitees in the exercise of his rights under the easement. He has a more limited framework than the owner of a fee. His duty does not require him to do things not permitted under the easement. If the approach is a public way his duty under OCGA § 51-3-1 is to exercise due care within the confines of his right in the public way. His rights in the public way may be quite limited but nonetheless exist.

Id. at 196.

The decisions in *Todd* and *Motel Properties*, supra, concerned injuries caused by physical defects in property located outside the premises and whether those defects were located on an approach to the premises. Nevertheless, both decisions provide guidance on the present issue – whether under OCGA 51-3-1 the non-contiguous property where the criminal attack on Martin occurred was an approach to the park premises on which Six Flags had a duty to protect Martin from the attack. The evidence shows that the attack occurred at the CCT bus stop, located about 200 feet

13

from the park premises, on public property owned by Cobb County adjacent to the intersection of Six Flags Parkway and South Service Road. As *Motel Properties* makes clear, to conclude that a premises owner has extended the approach to his premises over a non-contiguous public way, there must be evidence of a positive act demonstrating the owner's control over the public way. *Motel Properties*, 263 Ga. at 486. And under *Todd*, if the claimed approach is a public way, the owner's duty under OCGA § 51-3-1 "is to exercise due care within the confines of his right in the public way." *Todd*, 258 Ga. at 196. As an example of control over non-contiguous property where the claim is that a physical defect in the property caused injury, *Motel Properties* cited to evidence that a premises owner took positive action to exercise control by constructing "a sidewalk, ramp, or other direct approach" over the property. *Motel Properties*, 263 Ga. at 486. Martin contends the record contains evidence that Six Flags took similar positive action to extend the approach to its premises over the Cobb County public property at the CCT bus stop where the attack occurred. There is evidence that, for the benefit of its business, Six Flags used barricades and signs to direct pedestrian and vehicular traffic of its invitees along Six Flags Parkway adjacent to the bus stop, and that Six Flags worked with Cobb County to cut grass and pick up trash to maintain the appearance of the Parkway and adjacent

14

public property. During busy periods at the park, Six Flags would also deploy its own security staff and off-duty Cobb County police officers employed by Six Flags to help on-duty Cobb County police direct traffic in public ways leading to the park.

Even assuming this was evidence that Six Flags took positive action to exercise rights to control pedestrian and vehicular traffic in those public ways and to physically maintain those public ways as an approach to the park, this is not evidence that Six Flags had or exercised any right to control security against a criminal attack in those public ways. Martin's claim is not that Six Flags failed under OCGA § 51-3-1 to keep a non-contiguous approach safe from a physical defect that caused his injury. Rather, Martin claims that Six Flags failed under OCGA § 51-3-1 to keep a non-contiguous approach, located on a public way, safe from a foreseeable criminal attack that caused his injury. Cobb County, as the governmental entity which owned the public way where the criminal attack occurred, had the duty to provide police protection to keep the pubic way safe from any attack. See *Dept. of Transp. v. Brown*, 267 Ga. 6, 8-9 (471 SE2d 849) (1996); Ga. Const. of 1983, Art. I, Sec. I, Par. II (protection of persons and property is the paramount duty of government). Six Flags had no such duty and no ability to control the County's provision of security. The public way where the criminal attack occurred was located in Cobb County Police

15

precinct 2, in which Cobb County deployed police officers who responded to any security issues in public areas around the park. There is no evidence that Six Flags acquired or exercised any right to control the provision of security from criminal attacks occurring on public property outside the park. Contrary to the majority's statement, there is no evidence that Cobb County police allowed or required that Six Flags provide security against criminal activity in the area around the CCT bus stop or in any other public area owned by Cobb County. There is no basis for the majority's inference that Six Flags provided security against criminal activity in "hot spot" areas on public property near the bus stops. The testimony given by a Cobb County police officer (who had worked off-duty for Six Flags for 30 years) that the bus stop areas were "hotspots" around closing time at the park referred to high levels of vehicular and pedestrian traffic in the area, not criminal activity. The same police officer testified that there had been no fighting incident in the bus stop area prior to the attack on Martin, and that no attack like the gang assault on Martin had ever previously occurred in or around the park. Six Flags security officers did not intervene on Cobb County property to provide security, and they did not respond to the criminal attack on Martin at the CCT bus stop. Cobb County police officers responded to the criminal attack on Martin and conducted an investigation. Six Flags

16

employed off-duty Cobb County police officers at the park, and sometimes deployed those off-duty officers to direct vehicular and pedestrian traffic along public ways leading to the park. But Six Flags did not employ the off-duty Cobb County officers to exercise any right held by Six Flags to provide security from criminal attacks in the public ways. Rather, Six Flags hired the off-duty police officers with the understanding that they retained their official duty to enforce the law and maintain the peace, and if the officers exercised their discretion to respond to security issues in public areas around the park, they did so in the discharge of their official duties as police officers. *Stryker v. State*, 297 Ga. App. 493, 494 (677 SE2d 680) (2009) (law enforcement officers have general duty to enforce the law and maintain the peace and carry this responsibility on and off duty).

In short, even if Six Flags exercised rights to control pedestrian and vehicular traffic and to physically maintain the public way leading to the park, there is no evidence that Six Flags had any right to control the provision of security to prevent a criminal attack on the non-contiguous public way where the attack against Martin occurred. It follows that there is no basis to find that the attack occurred on an approach to the park on which Six Flags had a right to provide security to protect Martin within the meaning of OCGA § 51-3-1. *Motel Properties*, supra; *Todd*, supra.

17

Accordingly, as a matter of law, Six Flags had no duty to exercise ordinary care under OCGA § 51-3-1 to keep the public way safe from the attack on Martin. *Motel Properties*, 263 Ga. at 486, n.6.[4]

---

[4] Even assuming that the attack on Martin was foreseeable, and that the attack occurred on an approach over which Six Flags had the right to provide security, Martin's claim under OCGA § 51-3-1 fails as a matter of law for an additional reason. Martin was no longer a Six Flags invitee after he left the Six Flags park premises and approaches, visited a nearby hotel, and then returned to the park premises after the park had closed (at 9:00 p.m.) for the sole purpose of waiting for a bus. Martin's status as an invitee or licensee on the business premises is determined by the nature of his relation or contact with the premises owner. *Armstrong v. Sundance Entertainment, Inc.*, 179 Ga. App. 635, 635 (347 SE2d 292) (1986). "The test is whether the injured person *at the time of the injury* had *present* business relations with the owner of the premises which would render his presence of mutual aid to both, or whether his presence on the premises was for his own convenience." Id. (citation and punctuation omitted). "[T]he requirement that an invitee not go beyond the limits of his invitation extends to the temporal dimension as well as the spatial: one who uses the premises of a merchant at a time beyond that to which an implied invitation extends is a mere licensee." Id. at 636. When Martin returned to the park premises after the park had closed, he did so for his own convenience – to wait on a bus. Accordingly, Martin returned to the premises after closing time, not as an invitee to the park for the mutual benefit of the parties, but as a licensee for his sole convenience. Id.; *Clark v. Rich's, Inc.*, 114 Ga. App. 242 (150 SE2d 716) (1966). Because Martin was not an invitee when the injury occurred, his claim under OCGA § 51-3-1 failed as a matter of law. *Armstrong*, 179 Ga. App. at 635-636. Six Flags raised this argument in its motions for a directed verdict and for judgment notwithstanding the verdict, and contended in its brief on appeal that, at the time of the attack, Martin was a CCT invitee as he waited on the bus, not a Six Flags invitee.

2. Martin also claimed that, even if the criminal attack occurred outside the Six Flags park premises and approaches, Six Flags was liable because it was a foreseeable attack caused by Six Flag's failure to exercise ordinary care under OCGA § 51-3-1 to keep the park premises and approaches safe while he was an invitee prior to leaving the park.

In support of this claim, Martin cites to the decision in *Wilks v. Piggly Wiggly Southern, Inc*, 207 Ga. App. 842 (429 SE2d 322) (1993), where this Court sanctioned a claim pursuant to OCGA § 51-3-1 seeking to impose liability on a premises owner for a criminal attack that occurred outside the premises and approaches controlled by the owner. Wilks was an invited shopper at the Piggly Wiggly grocery store located in a strip mall. Id. at 842. When Wilks left the store premises at night, evidence showed that two men were loitering near the door of the store. Id. The men followed Wilks as he walked away from the store premises past two other stores to the end of the mall, and continued to follow Wilks as he walked another 20 to 25 yards beyond the mall to an unlit area where the men attacked Wilks. Id. There was evidence that, two or three months before Wilks was attacked, another store customer was the victim of a purse snatching in the parking lot in front of the store. Id. at 843. Other evidence showed that potential attackers were loitering near pay telephones in front of the

19

store, and that they appeared to be "pretending to use the telephone but actually were watching for victims." Id. Evidence showed that, even though the store attempted to stop loitering around the pay phones, and stationed store employees in the parking lot after dark, "individuals continued to loiter" near the store at night. Id. at 844. On these facts, Wilks brought a premises liability claim against the Piggly Wiggly store pursuant to OCGA § 51-3-1 claiming that the store failed to exercise ordinary care to provide security to protect him from a criminal attack it had reason to foresee. The evidence was undisputed that the attack on Wilks occurred in an area the store did not own or control. Id. at 843. The trial court granted summary judgment in favor of Piggly Wiggly on the basis that the attack did not occur on the store premises or approaches controlled by Piggly Wiggly. Id. But this Court reversed. Despite undisputed evidence that the attack occurred outside the store premises and approaches on property not owned or controlled by Piggly Wiggly, *Wilks* found that the attack was foreseeable; that Piggly Wiggly had a duty under OCGA § 51-3-1 to Wilks, as an invitee, "to guard against injury from dangerous characters," and to protect Wilks "from the known dangers posed by loiterers after dark on [the store's] premises;" and that a jury should decide if Piggly Wiggly had provided sufficient security to protect Wilks from the attack. Id. at 843-844.

20

I conclude that *Wilks* was wrongly decided and should be overruled. The evidence was undisputed in *Wilks* that the criminal attack occurred outside the store premises and approaches when Wilks was no longer an invitee, and at a location where Piggly Wiggly had no right to exercise control over security to prevent the attack. In *Motel Properties*, 263 Ga. at 486, the Supreme Court reaffirmed the principle that imposition of the duty under OCGA § 51-3-1 on a premises owner to exercise ordinary care to keep the premises and approaches safe for invitees is predicated on the owner's right to control that property. Even if the criminal attack on Wilks after leaving the premises and approaches was foreseeable, Piggly Wiggly had no duty under the plain language of OCGA § 51-3-1 to prevent the attack at that location. Just as the Supreme Court noted with respect to approaches in *Motel Properties*, limiting liability under OCGA § 51-3-1 to third-party criminal attacks that occur on the premises and approaches controlled by the owner "is necessary in order to avoid imposing upon invitors an unknowable and impossible burden for maintaining [security over] an undefined circumference of properties." *Motel Properties*, 263 Ga. at 486 (citation and punctuation omitted).[5]

_____

[5] For example, in *Wilks*, supra, by what standard was Piggly Wiggly to discern whether a particular individual on its premises, who engaged in no overt criminal activity, might be loitering with the intent to follow a store invitee off the premises

21

Accordingly, while Martin was an invitee on the Six Flags park premises and approaches, Six Flags had a duty under OCGA § 51-3-1 to exercise ordinary care to protect him from foreseeable criminal attack on the premises and approaches under its control.[6] But OCGA § 51-3-1 imposed no duty on Six Flags, while Martin was an invitee, to protect him from a criminal attack – even a foreseeable attack – that subsequently occurred at a location outside the park premises and approaches, where

_____

and attack the invitee? Even if Piggly Wiggly had reason to suspect that the individual had this intent, and ejected the individual from the premises, how would this prevent the individual from simply waiting off the premises to attack the invitee? And if liability is to be imposed on a business like Piggly Wiggly for an attack against an invitee who has left the store premises and approaches, at what distance from the premises is the business still liable for the attack? After an invitee on foot has been followed for a half mile? After an invitee in a vehicle has been followed for three miles? It is simply not reasonable to construe OCGA § 51-3-1 to impose a duty on premises owners to prevent injury to immediate former invitees (or potential invitees) caused by third-party criminal attack off the premises and approaches controlled by the owner.

[6] OCGA § 51-3-1 does not foreclose the possibility that a foreseeable criminal attack against an invitee that initially occurs on the owner's premises or approaches may be a proximate cause of an injury to the invitee that subsequently occurs outside the premises and approaches. For example, an invitee may suffer an injury that occurs outside the premises and approaches while attempting to escape from an attack which occurred on the premises. On those facts, imposition of liability on the premises owner under OCGA § 51-3-1 would be based on showing that injury resulted from a foreseeable criminal attack that occurred at a location on the premises or approaches where the owner's right of control at that location provided means to prevent the attack.

Six Flags had no right of control over security. Whether analyzed in terms of the duty imposed to keep the premises and approaches safe, or in terms of causation, there is no basis to impose liability under OCGA § 51-3-1 on the premises owner for a third-party criminal attack against a former invitee, which occurs at a location off the premises and approaches. "[A] property owner is not an insurer of an invitee's safety, and an intervening criminal act by a third party generally insulates a proprietor from liability unless such criminal act was reasonably foreseeable." *Ratliff v. McDonald*, 326 Ga. App. 306, 312 (756 SE2d 569) (2014) (Citation and punctuation omitted). Under OCGA § 51-3-1, a premises owner may be held liable for a criminal attack on an invitee occurring on the premises or approaches because, when the attack is foreseeable, the statute imposes a duty on the owner to protect the invitee from the attack by providing security sufficient to keep safe the premises and approaches under the owner's control. *Sturbridge Partners*, 267 Ga. at 785-786. Thus the duty imposed on the owner by OCGA § 51-3-1 to keep the premises and approaches safe is the basis for finding that a foreseeable criminal attack on the premises or approaches is not an intervening proximate cause that insulates the owner from liability. But OCGA § 51-3-1 imposes no duty on the premises owner to provide security at a location off the premises and approaches to prevent a criminal attack against a former

23

invitee, even if the attack is foreseeable. In the absence of such duty, the general rule applies that a criminal attack against a former invitee off the premises and approaches intervenes as the sole proximate cause of injury from the attack and supercedes a claim that the attack on the former invitee was caused by the owner's failure under OCGA § 51-3-1 to provide adequate security on the premises or approaches. See *Bradley Center v. Wessner*, 250 Ga. 199, 202-203 (296 SE2d 693) (1982). Moreover, for the reasons set forth above, including an owner's lack of ability to prevent criminal attacks occurring off the premises and approaches, a claim that an owner's failure to provide adequate security on the premises or approaches was a concurring proximate cause of a subsequent criminal attack off the premises and approaches alleges negligence too remote to constitute a proximate cause of the attack. See *McAuley v. Wills*, 251 Ga. 3, 7 (303 SE2d 258) (1983). For example, in *Godwin v. Olshan*, 161 Ga. App. 35 (288 SE2d 850) (1982), we rejected a claim that a landlord's alleged breach of duty under OCGA § 51-3-1 to provide adequate security in common areas of the shopping center premises under his control was a contributing cause of a criminal attack against a tenant which occurred in an adjacent portion of the premises over which the landlord had no control. We found the tenant's claim that better security in the landlord's common areas would have deterred the criminal

24

attack failed on the issue of causation "because of the extraordinary speculation inherent in the subject of deterrence of men bent upon criminal ventures." Id. at 37 (Citation and punctuation omitted). A refusal to allow recovery on this basis is a policy decision that these are plain and undisputed cases where causation fails as a matter of law, and is simply another way of saying "that the defendant was under no duty to protect the plaintiff from the injury which in fact occurred." *McAuley*, 251 Ga. at 7.

For these reasons, in Case No. A15A0828, the judgment imposing liability against Six Flags pursuant to OCGA § 51-3-1 should be reversed, and the case remanded with directions to enter judgment in favor of Six Flags.

3. I would find Martin's cross-appeal in Case No. A15A0829 either moot or without merit.

(a) Martin claims the trial court erroneously denied his request to instruct the jury on the "voluntary undertaking" doctrine as an alternative cause of action against Six Flags for negligent provision of security. I find no error. First, the only cause of action set forth by Martin against Six Flags in the pre-trial order was a premises liability claim pursuant to OCGA § 51-3-1. Martin was not entitled to a jury instruction on a cause of action not advanced in the pre-trial order. *Ga. Dept. of*

*Human Resources v. Phillips*, 268 Ga. 316, 318 (486 SE2d 851) (1997); OCGA § 9-11-16. Second, there was no evidence to support the instruction.

(b) Martin contends that the trial court erred by denying his request to enter the judgment against Six Flags effective as of the verdict date, which erroneously deprived him of $422,534.22 of post-judgment interest against Six Flags. This enumeration of error should be rendered moot by reversal of the judgment against Six Flags in Case No. A15A0828.

I am authorized to state that Chief Judge Doyle joins in this dissent.